Moncure, P.'
This is á supersedeas to a judgment rendered by the ■ Circuit court of the city of Richmond on the 11th day of May 1871, in an action of debt, in which the First Hational Bank of Richmond was plaintiff, and John L. Hodge, executor of William L. Hodge, defendant. The action was brought on two promissory notes, each of them payable on demand, and signed by William L. Hodge; one of them dated April 5th, 1867, payable to the order of “ S. A. Glover, cash’r,” for 83,700, “for value, being for a check Mr. Fant, pres’t, gave me on Lockwood & Co., New York;” and the *52 other dated 27 July 1867, payable “to the order of S/ Gi-lover, cashier, at the First National Bank, Richmond,'’ for $2,037.74, “for value received.” The case-was tried on the general issue, and, neither party requiring a jury to he impanneled therein, the whole ma^er °f ^aw a]Qd fact was thereupon heard and deter-' mined, and judgment given hy the court. The judgment was in favor of the plaintiff for the aggregate amount .of the two notes, to wit: $5,737.74, with interest on the amount of each from its date till payment and costs.
Two exceptions were taken hy the defendant in the progress of the case in the court below, and bills of exception were accordingly signed by the judge: one of them was to the judgment given by the court in the case, and sets out the evidence on both sides; the other ■was to the action of the court in overruling the defendant’s motion to set aside the said judgment, and grant him a new trial upon the grounds of error in the said judgment, and of newly-discovered evidence, which is set out in the bill of exceptions. The defendant applied for and obtained from this court a supersedeas to the said judgment, and the errors assigned arise upon the two bills of exceptions aforesaid.
That arising upon the first bill presents the question, Was a right judgment given hy the Oh’cuit court upon the evidence certified in that bill?
On the trial of the cause, the plaintiffs, in support of the issue on their part joined, offered in evidence the two promissory notes aforesaid, called in the proceedings, or hy the parties, “demand notes,” or “call notes,” which are set out in the hill “in hcec verba;” and copies of the accounts of the defendant’s testator with the plaintiff, being the same with the bill of particulars filed with the common court, which copies are also set out. And the plaintiffs then rested.
The plaintiffs thus clearly made out a good prima facie case; and, if the evidence had stopped here, the *53 judgment rendered by the court would certainly have been right. It was not pretended—indeed, it was conceded—by the defendant, that the said notes were in fact, as they purported to be, signed by his testator, ¥m. L. Hodge. They are promissory notes in the ordinary form, and such as the plaintiffs had a right to take of their debtors. They expressly state on their face that they were given for value received, and one of them specifies the particular value received, which is evidence of the fact against the maker and his representatives.
But notwithstanding the form and nature of the notes, ■ and the expressions which they contaiuf yet in a case between the original parties to the notes or their representatives, or between one of the original parties and the representative of the other, such as this case is, it is competent for the defendant to show in his defence a a want or failure of consideration of the notes, or any other matter which would render them illegal or void in whole or in part.
Accordingly, the defendant contended that these notes were given by his testator on the mistaken idea that he was indebted in the amount of them to the Virginia Brick Company, of which he was a large stockholder, and out of transactions with which company the claim of the plaintiff originally arose; whereas, in truth and in fact, he was not, when he gave the said notes, indebted to the said company, but had previously fully discharged bis debt to the same; and he introduced evidence tending to show, and sufficient to show, that such was the fact.
Now, if these notes had been given to, and this action bad been brought by, the brick company, instead of the plaintiff’ no doubt the evidence introduced by the defendant as aforesaid would have defeated the action. But these notes having beeu given to, and this action having been brought by, the plaintiff, instead of the brick company, whether said notes were given in con *54 sideration of a debt due to the plaintiff by the defend'an^’s testator or by the brick company, the said evidence was not sufficient to defeat the action, unless it was coupled with proof that the said notes were given to the plaintiff by the defendant’s testator on condition that he was indebted to the said company in the amount of said notes.
The only proof of that kind which we find in the record is a paper marked “ Exhibit E,” referred to in, and returned with, the deposition of IT. G. Fant, a witness in behalf of the defendant, which paper was signed by said Fant and handed to said testator, and is in these words :
“Washington, 16th May, 1867.
“ The demand note of Wm. L. Hodge, favor of S. A. Glover, dated April 1866, for thirty-seven hundred dollars, has been given merely as a voucher, until it is ascertained that he has paid the full amount due by him on stock in the brick company.
“H. G. Fant, President.”
Reference is here made to one only of the two demandi notes aforesaid, to wit, the one for $3,700. In fact the-other, for $2,037.74, was not given until more than two-months thereafter, to wit, the 27th of July 1867. It is. not pretended that the latter was executed on any condition, or with any understanding, even with Fant, that the-validity of the note should depend upon the maker’s-being indebted at that time to the brick company in the-amount of the note, or in any amount.
But as to the note for $3,700, what is the effect of the* paper marked “Exhibit F,” just set out?
If that debt had been due, and that note had been-given to H. G. Fant individually, then “Exhibit F” would have been evidence against him, and, coupled with the other evidence in the cause tending to show that the maker of the note had paid the full amount due by him *55 on stock in the brick company, would, no doubt, have been sufficient to defeat the action as to that note.
But that debt was due, and that note was given to the First Rational Bank of Richmond. Though the note was payable to the order of S. A. Glover, cash’r, it was in effect payable to the said bank, of which he was cashier; that being the usual form of such transactions. The question is, how can the bank be effected by ‘ * Exhibit F ?”
The bank can only be so effected upon the ground that Exhibit F was signed by an agent of the bank duly authorized to sign it.
Was it signed by such an agent? It is not pretended that any special or express authority was conferred upon Fant by the bank to sign that paper ; or that the bank confirmed the act after it was done. Fant being asked, on his examination in chief by the defendant: “At the time you signed the paper marked F, did you give it as president of the First Rational Bank, and as intending to bind that institution?” he answered: “It was presented to me by Mr. Hodge, and without much reflection, I signed it as it purports to be, by the president of the First Rational Bank of Richmond. The paper must speak for itself. If I had the power as president of the bank to make such a contract, I made it with Mr. Hodge in the hurried manner in which it was presented to me.” Being asked on cross-examination the following question: “ The demand note of Mr. Wm. L. Hodge for $3,700 bears date April 5, 1867, the receipt given by you, and alluded to in your examination in chief as Exhibit F, is dated May 15th, (16th?) 1867. Will you explain why it is, if that receipt refers to the note of April 5th, 1867, that it bears a different date ?” he answered: “It does refer to the note dated April 5th, 1867 ; it was given in a hurried way by me, over a month after the note for $3,700 was executed by Mr. Hodge. He stated to me at the time, that he thought there was some mistake about his owing the Virginia Brick Com *56 pany, and asked me to sign the paper referred to, which I did.” And being 'further asked, on cross-examina^011: “Was the board of directors of the First Hational Bank notified, at the time that you gave the receipts marked F, before referred to, of your doing so, an(^ was ^ given by the authority of the board ?” he answered: “Rever, to my knowledge, nor by authority of the board.” The evidence thus extracted from the examination in chief and cross examination of the witness, Fant, appears to be in conflict, at least some portion of it, with another part of the evidence of the same witness in his examination in chief, where he says: “At the tim& Mr. Hodge gave the bank the note for $3,700 of the $5,700, he expressed to me the opinion or doubt whether he owed any thing to the Virginia Brick Company, and handed me at the time of signing said note of $3,700 the paper marked F for my signature, which I signed.” But in a case such as this, where the whole matter of law and fact is heard and determined, and judgment given by the court, and there is a bill of exceptions to such judgment setting out the- evidence in the case, in an appellate court the bill of exceptions is regarded in the light of a demurrer to evidence, and where there is a conflict of evidence, the conflicting evidence in favor of the exceptant is disregarded by the court. According to that rule we must disregard the statement of the witness, that he signed Exhibit F at the time the note for $3,700 was signed by Hodge, and credit his statement that “ it was given in a hurried way ” by him, “over a month after the note for $3,700 was /"executed by Mr. Hodge.”
Then if Fant had any authority to bind the bank by the admission made in Exhibit F, he must have derived that authority from, and in virtue of his office of president of the bank. Bid he derive any such authority from that source ?
The First National Bank of Richmond was created *57 under the act of Congress approved June 3, 1864, entitled “an act to provide currency, secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof.” 13 U. S. Stat. at large, p. 99. The fifth section of that act declares how banking associations may be formed. The eighth section declares when such an association shall become a body corporate, and what general powers it shall have; and among other things, that “it may elect or appoint directors, and by its board of directors appoint a president, vice-president, cashier and other officers, define their duties,” &c., “ and exercise under this act all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of. exchange, and other evidences of debt,” &c., “by loauing money on personal security,” &c., “and its board of directors shall also have power to define and regulate, by by-laws not inconsistent with the provisions of this act, the manner in which,” among other things, “its general business” may be “conducted,” &c.” “ And its usual business shall be transacted at an office or banking house located in the place specified in its organization certificate.” The ninth section declares “that the affairs of every association shall be managed by not less than five directors, one of whom shall be the president;” what shall be their qualification as to residenee, &c. ; how much of the capital stock of the association they must severally own, and what oath they shall' take.
Thus it appears that the general management of the business of the bank, and the interest therein of the shareholders, are confided to the care of the board of directors, and there is in the act no specification of powers or duties to be exercised by the president or cashier. The election or appointment of such officers by the board is provided for by the act; which also provides that the board may define their duties. But there is nothing in *58 the record to show whether such duties have ever been so defined. ¥e must, therefore, regard the president and cashier of this bank as having only such powers as may be incident to their offices respectively, in their very nature, in the absence of anything in the act of incorporation to the contrary; and we must regard all other powers needful to the management of the concerns and -business of the bank as residing alone in the directory.
Then, had Fant any inherent power as president, to bind the bank by his admission made in “ Exhibit F ?” The president of a bank has, it seems, very little inherent power. He is generally, if not always, a member of the board of directors, and chosen by the board from their own number. It- is his duty to preside at meetings of the board. “ Ordinarily;” we are told, “ the position is one of dignity, and of indefinite general responsibility, rather than of any great and accurately known power. The president is usually expected to exercise a more constant, immediate, and personal supervision over the daily affairs of the bank - than is required from any other director. Usage, or directorial votes, may confer upon him special functions, and may extend his authority to correspond with the increase of active duties. But the authority inherent in the office itself is very small; indeed, it is very difficult to say precisely how or where it is much in excess of that which can be exercised by any other single director.” Morse on Banks and Banking, p. 128. “A careful collation of all the adjudicated cases, it must be confessed,” continues the same author, “wears a striking and peculiar aspect which is not very favorable to the assumption of any species of executive power by a bank president without direct authorization.” Id. 129. “ Indeed, it is a singular fact,” he further says, “that the entire collection of judicial authorities justifies the enunciation of .only one act as falling within the properly inherent power of the president. This solitary function is to take charge.of the litigation of the bank. There *59 is no question but that this matter belongs to Mm by virtue of his office. He may institute and carry on legal proceedings to collect demands or claims of the bank. He may appear, answer, and defend in suits against the bank. He may retain and employ counsel on behalf of the bank,” &c. Id. The powers and duties of a cashier, in virtue of his office, are, on the other hand, much more numerous, though Ms office is strictly executive. Without attempting to enumerate them, it being unnecessary in this case to do so, it is sufficient to refer to what is said on the subject in the same book, p. 137, and seq.
But certainly, neither the president nor the cashier, nor both combined, could, virtute officii, giye-up a debt or-liability to the bank, or bind the bank, by such an admission as is contained in “Exhibit E” aforesaid. This, I think, plainly appears from the cases cited by the counsel for the bank. In Bank of the United States v. Dunn, 6 Peters U. S. R., 51, it was held, that “ an agreement by the president and cashier of the Bank of the United States, that the endorser of a promissory note shall not be liable on Ms indorsement, does not bind the bank. It is not the duty' of the cashier and president to make such contracts; nor have they the power to bind the-bank, except in the discharge of their ordinary duties; All discounts are made under the authority of the directors, and it is' for them to fix any conditions which maybe proper in loaning money.” This is the reporter’s heading of the decision, but it is fully sustained by what is said in, and is chiefly in the very words of, the opinion of the court asdelivered by Mr. Justice McLean. In United States v. City Bank of Columbus, 21 How. U. S. R., 356, it was held, according to the reporter’s marginal abstract of the case, which is no doubt correct, that “ where the cashier of a bank wrote to the Secretary of the Treasury, saying that the bearer of the letter was authorized to contract for the transfer of money from New York to New- *60 Orleans, and such a transaction was not within the scope of the powers of the cashier, nor authorized by the directors, the bank was not bound to reimburse the money which the Secretary of the Treasury advanced.” The cashier signed the letter as such, and Miner, the bearer of it, was a director of the bank, which fact was stated in the letter. A by-law of the bank was put in proof fo show that it might be inferred from it that Moodie, whose name was signed to the letter, had authority as cashier to empower Miner, as a director of the bank, to enter into such a contract as he had made with the Secretary of the treasury. The by-law was : “ A committee of two shall be appointed every six months to advise with the president and cashier. In their absence all the ordinary business of the bank may be done by the president and cashier; and if either of them be not present, then by the other alone ; but any discount, negotiation or contract, whether made by the board or committee, is to be done by the consent of all present.” Notwithstanding-the Terms of this by-law, and the'fact that the agent selected by the cashier was a director of the bank, it was held in. this case that the bank was not bound by the act of the pretended agent; and Mr. Justice Wayne, in delivering the opinion of the court, cited and relied on the case of the Bank of the United States v. Dunn, supra, and other cases. After adverting to the fact that the release in that case was executed both by the president and cashier, and yet was held not to be binding on the bank, neither nor both having any authority to make contracts of that kind, the court proceeded to say : “ The case before us is one in which a cashier acts alone, and in which he testifies that he did so without any consultation with the president or directors of the company, and of which they had no information' from him of the transaction until after the failure of Miner to pay the money in New Orleans. The act under which the city bank of Columbus ^-became a corporation does not, in any part of it, give any *61 power to a cashier to act independently of the directors,” &c. These remarks apply to this case, only substituting the word president for that of cashier. In Olney v. Chadsey, 7 Rhode Island R. 225, it was held that the president of a bank has no authority, virtute officii, to surrender or release the claims of the bank against any one, and ° can only derive such authority from the vote of the hoard of directors, or from their assent, express or implied. See also Bank of the Metropolis v. Jones, 8 Pet. U. S. R. 12 ; Merchants Bank v. Marion Bank, 3 Gill’s R. 96 ; 1 Sandf. Sup. Ct. R. 158, Brouwer v. Appleby; Hoyt v. Thompson, 1 Selden’s R. 320.; Spyker v. Spence, 8 Alab. R. 333 ; 1 Mete. Ky. R. 550, Mt. Sterling and Jeffersonville Turnpike Co. v. Looney
I think we may fairly conclude, from what has been said, that Fant had no authority, in virtue of his office-of president, to bind the bank by his admission made in “ exhibit F.”
But the claim of the plaintiff in error to a discharge from liability of his testator’s estate from the demand of' the bank, seems to rest mainly upon the following grounds: First, that the debt of said testator to the bank, was created in consideration of a debt supposed to be due by him to the brick company aforesaid. Secondly, that there was then, in point of fact, no debt due from, him to that company, as the parties supposed. Thirdly, that there was such a connection between the brick company and the bank, or such a contract or understanding between the said testator and the hank, as made the-validity of the debt from him to the bank dependent upon the existence of the debt from him to the said company, and aB no such debt as the latter existed, the former was, therefore, invalid. And fourthly, that the said contract or understanding was had with Fant, as-agent for the hank, and that he was so held out to the world by the bank as agent for such purposes, as that the hank is estopped from denying such agency in this- *62 case. I will briefly consider these grounds in the above order.
As to the first: There seems to be no doubt but that the debt from said testator to the bank had its origin in a debt from him to the brick company. On the 7th of July 1866, he being indebted to said company as a stockholder, and for assessments, in an amount exceeding $5,700: that company, by the said Fant, their treasurer, on that day, drew two drafts on W. L. Hodge (the said testator), Washington, D. C., one of them for $3,825, specified in the draft to be “$3,750 and 4 months int., brick note,” and the other for $1,875, specified in the draft to be for “valued received,” with a direction therein “to charge to account of” the drawer, and amounting together to $5,700. Ho time for payment was named in either of them. Both were payable “to the order of S. A. Glover, cashier,” he being then cashier of the said bank. On the day of their date, it seems they were discounted by the said bank, and the proceeds were paid by it to the brick company. They were endorsed “credit my account—S. A. Glover, cashier”; and on the 13th of July 1866, they were enclosed in a letter from said Glover, cashier, to said W. L. Hodge, with a request that he would “please deposit to our credit with the First Hational Bank of Washington.” This was the origin of the debt claimed by the bank to be due from W. L. Hodge, which was, ■therefore, created in consideration of the debt supposed to be due by him to the brick company as aforesaid.”
As to the second ground—“that there was then, in point of fact, no debt due by him to said company.” ’There was certainly a debt due by him to said company at the time the said drafts were drawn, and at the time they were endorsed to and received by him, and in an amount about equal to .the amount of the said two drafts. But it is said that these drafts were never accepted by .him; that he never became indebted to the bank on that *63 account; that he supposed they were placed in the hands of the bank by the brick company for collection merely; that two drafts were afterwards drawn on him by the brick company for the same debt, one of them for $1,884.37, drawn by “M. T. Jefferies, treasurer,” dated 8th August 1866, accepted 9th August 1866, and payable 30 days after date; and the other for $3,875, or $3,825 with interest from date, drawn by “ George B. Cadwallader, Treasurer Virginia Brick Company, dated September 5, 1866, accepted September 10, 1866, and payable 90 days after date; and that these two drafts were paid, at maturity, to Riggs. & Co., bankers, at Washington City, to whose order they were endorsed “by S. A. Glover, cashier,” having been deposited in said bank by the drawers for collection, and having been accordingly collected in that way. The letter of Glover, cashier, to W. L. Hodge, of the 13th of July 1866, and the two drafts of “H. G. Fant, treasurer,” of the 7th of July 1866, amounting together to $5,700 as aforesaid, seem to have been duly received by said Hodge, and were found to be in his possession at his death. It does not appear that he ever answered the said letter, and if so, in what way. * He did not accept the drafts, unless his failure to refuse to accept or pay them, or to reply to the letter, can be considered as an implied acceptance. He certainly did not deposit the amount in the First National Bank of Washington, as requested in said letter, nor make payment in any other manner. It does not appear that the First National Bank of Bichmond, or any of its officers or agents, ever enquired, by letter or otherwise, of W. L. Hodge about the payment of these drafts. Faut says there was some correspondence about them, but he does not recollect the facts. It appears that, after crediting him with the $5,700 received by the brick company from the said bank for the amount of the said drafts, there was nothing due from him to that company. Notwithstanding *64 which fact, shortly thereafter, to wit: in August and September 1866, the two drafts were drawn, one by M. T. Jefferies, treasurer, for $1,884.37, and the other by George B. Cadwallader, treasurer of said company, for $3,875, and were afterwards accepted and paid by said Hodge as aforesaid. Considering him • as liable to the bank for the amount of the said two drafts of the 7th of July 1866, amounting together to $5,700, then his payment of the two drafts afterwards drawn on him by said company as aforesaid was an overpayment of his debt to that company, therefore, by the amount of these drafts. The bank claims that he was liable to it for the amount of the said two drafts of the 7th of July 1866, because it paid the said amount to the brick company for the drafts, and enclosed them to him for payment to its credit in the First national Bank of Washington, and he never returned the drafts, nor objected to their payment. , It also claims that the said two drafts operated as an equitable assignment to it of the debt then due by him to the brick company. It does not appear that the bank ever set up any claim against the brick company to refund the money paid for the said drafts. Hor does it appear that the bank made any other demand, than as aforesaid, of the said W. L. Hodge, for the amount of the said drafts, until March 30th, 1867. On that day Fant drew on him, at one day’s sight, for $5,700 (precisely the amount of the principal of the two drafts aforesaid), payable to the order of S. A. Glover, cashier, which draft was accepted by Hodge on the 1st of April 1867, and was paid by him with means furnished by Fant, as will be presently mentioned. In a letter written by Fant to Hodge, dated on the same day with the said draft, which letter, being misplaced, was not found until after the trial, when it was produced on a motion for a new trial; and in support of such motion, the writer said: “We make up our quarterly report to-day. I have drawn on you to *65 day, at one day’s sight, for what appears to be due by you to the bank. Accept, and I will be with you in time to provide for it.” In a postscript he said: 4 4 Your account and ours do not agree, but that can be fixed hereafter.” Fant, in his deposition, which was taken by the defendant, being asked, 44Do you know from whence Mr. ¥m. L. Hodge obtained the money with which he paid this draft for $5,700?” answered: 44 As president of said bank, I gave him a draft on Lockwood & Co., of New York, for $3,700, and authorized him to make a check on the said First National Bank for $2,000, for which he gave the said bank his obligations.” These are the two notes on demand, called call-notes or loans, on which this action was brought, one of them for $3,700, dated April 5,1867, and the other for $2,037.74, dated July 27,1867, as aforesaid. Being asked to state for what the said draft for $5,700 was drawn, the same witness said: 44It was drawn for the indebtedness of Wm. L. Hodge to the First National Bank of Richmond, as advised by me of that date.” And being further asked whether the said draft was on account of alleged indebtedness of Wm. L. Hodge to the brick company? he answered: “Originally it grew out of the indebtedness to the Virginia Brick Company; but at the time of payment was the property of the First National Bank of Richmond. I mean the draft drawn March 30th, ’67, for $5,700.” In a letter from the defendant, J. L. Hodge, executor of W. L. Hodge, to H. G. Fant, dated August 24th, 1868, and read as evidence in the cause, the writer, among other things, gives the following account of the drafts and demand notes aforesaid: 4 ‘You, as treasurer,” of the brick company “on 7th July 1866, drew two sight drafts on my father, favor of S. A. Glover, cashier, for $3,825 and $1,875, respectively, which drafts were credited by the First National Bank of Richmond to the Virginia Brick Company, and forwarded to my father. They were not paid by him, but *66 stood in that shape till 30th March 1867, when you drew on him for $5,700, at one day’s sight, to cover these two former ones. He paid this $5,700 by your official draft on Lockwood & Co., New York, for $3,700, and his own check for $2,000 on First Rational Bank of Richmond. For the draft on Lockwood & Co. he afterwards, in April, 1867, gave his demand note for $3,700, taking in exchange your receipt, as president, that such note •was a mere voucher, and not to be paid, except it appeared he had not paid for his stock in brick company. For his check for $2,000 on First Rational Bank .of Richmond he afterwards, in July 1867, gave his demand noteYor $2,037.74, in answer to your request for same, stating, in his letter in which he forwarded it to you, that he did not know what it was for, but presumed it was in renewal of one for $2,000 he had given in January previous, which he requested should be returned. These two demand notes for $3,700 and $2,037.74 are the two items now in. question between the bank and my father’s estate. From the statement above, you will see that they were a continuation of the two drafts of July 7, 1866, drawn by you as treasurer of brick company, and credited to the brick company. That company has, however, been paid in full by my father, independently of these drafts, and has, therefore, been over-credited to the extent of $5,700.” Such is the account given of this transaction in the said letter, and it is, no doubt, substantially correct. The over-credit referred to, of $5,700 to the brick company, arose from the payment of the draft of M. T. Jefferies, treasurer, &c., of the 8th of August 1866, for $1,884.37, and the draft of George B. Cadwallader, treasurer, &c., of the 5th of September, 1866, for $3,825, which were paid by W. L. Hodge after he had received the two drafts of H. G. Fant, treasurer, of the 7th of July 1866, one for $3,825, and the other for $1,875, which were discounted by the bank, and enclosed by the cashier to said Hodge, in a letter dated *67 July 13th. 1866, as aforesaid. At that time, certainly, Hodge was indebted to the bi’ick company in an amount equal to the amount of the drafts.
As to the third ground—“that there was such a connection between the brick company and the bank, or such a contract or understanding between the said testator and the bank, as made the validity of the debt from Mm to the bank dependant upon the existence of the debt from him to the said company ; and as no such debt as the latter existed, the former was therefore invalid.” It has been shown that the drafts of the 7th of July 1866, were received by W. L. Hodge as aforesaid. He was indebted to the brick company in an amount equal to the amount of them ; and if said Hodge, by reason of his conduct in regard to. said drafts, rendered himself liable for the amount of the same to the bank ; or if the bank were entitled to enforce payment of said drafts against said Hodge, as equitable assignments of the debt due by-him to the brick company at the time they were drawn ; then, there is no foundation to sustain the point we are now considering. But let it be supposed, for the sake of argument, that Hodge did not so render himself liable for the amount of said drafts to the bank, and that the bank was not entitled to enforce them against him as equitable assignments of the said debt, then the question arises, was not the claim of the bank against him on those grounds, whether well or ill founded, a sufficient consideration for his assuming payment of the said claim, as he afterwards did by his acceptance of the said draft of March 30th, 1867, for $5,700, and by his execution of the said demand notes on the 5th of April and 27th July 1867 as aforesaid? Certainly it was; unless the brick company and the bank can be regarded as on e and the same institution, or as so connected with, or dependent on each other that a debt due by the Mne, is in effect a debt due by the other. It will not be pretended that there was any such connection between them as that. *68 Nor does it appear that there was in fact any connection between them tending to make them one institution, or bound for the acts or debts of each other. The only connection between them, if that can be called a connection, appears to have been, that some of the stockholders of the bank were also stockholders of the brick company. Certainly W. L. Hodge was a large stockholder of each. Fant was also, at the same time, president of the bank, and treasurer, or acting treasurer of the brick company; and the bank often discounted drafts of the company. But neither of these facts, nor all of them together, identified the two institutions, or made them responsible the one for the other. There were, no doubt, many stockholders of the one who were not, at the same time, stockholders of the other. Probably, most of the stockholders of the bank were not stockholders of the brick company, and so e converso. Then there is nothing in the third ground which can afford the defendant any aid. And now,
As to the fourth and last ground: “ that the said contract or understanding was had with Fant as agent for the bank, and that he was so held out to the world by the bank as agent for such purposes, as that the bank is estopped from denying such agency in this case.” This view is no doubt founded on the evidence of the cashier, Glover, who was introduced as a witness by the defendant, and who testified, among other things, “that H. G. Fant was the president of the plaintiffs; that he, Fant, made a large majority of the loans himself; that Fant had the general charge and conduct of the financial negotiations of the plaintiffs; that the board of directors did not meet regularly ; that the state of the bank was not laid before the directors generally ; that he supposed it was known to the directors how Fant acted ;” “thatFant made negotiations; that he controlled the credit of the bank, but that witness did not know if he did it irregularly; that Fant sometimes drew his own drafts as *69 president, and would sign checks if .not convenient for the cashier to do so &c. The general management of a bank belongs to the board of directors ; but it belongs to them as a trust for the benefit of the stockholders. Their power is not unlimited, but is confined within certain prescribed limits by the charter, and must be faithfully exercised for the purposes for which it is conferred. They cannot abandon their post of duty, and delegate their power to another. Potestas delégala non potest delegan. They must of necessity appoint ministerial agents to execute their judgments and orders. They are expressly empowered in this case to appoint a president and cashier, whose duties are not prescribed by the charter, nor, so far as appears from the record, by any by-laws. The duties and powers of these officers in this case, therefore, are only such as belong to their offices, virtute officii. The directors, no doubt, may empower a president or cashier to perform a special act not strictly embraced in the sphere of his duties and powers, ex officio, and they may sanction such an act after it is done, and thus give it the same effect as if it had been previously authorized. Their assent to such an act may, no doubt, also be sometimes inferred from circumstances. The directors of a bank cannot release without consideration a debt due to the bank; and a fortiori, they cannot empower the president to do so; and a multo fortiori, the president cannot do so virtute officii. The transactions of this bank with Mr. W. L. Hodge seem to have been conducted very loosely by the president, Mr. H. Gr. Fant. Probably the chief reason was, that Mr. Hodge was not only a gentleman of wealth, but a very large stockholder in the bank. The semi-annual dividend on his stock seems, at one time, to have been as much as $4,600. He was also a large stockholder in the brick company, out of his obligations to which his indebtedness to the bank originally arose. He seems, from his correspondence with Fant, to have had great confidence in him, *70 as Fant undoubtedly had in Hodge. Fant and Glover ma7 both have owed their appointments, as president anc^ cashier, to the influence of Hodge, which, from his great interest in the bank, must have been potential, if n°f controlling. It is not very strange, therefore, though Ve1'^ *rre£ular’ that lout’s drafts of July 7,1866, should have been enclosed by cashier Glover to Hodge himself, with a request to deposit the amount in the First national Bank of Washington : nor that the debt of Hodge on account of those drafts should have remained in that state for so long a time afterwards, Hodge not having returned the drafts, nor objected to his liability for them, so far as appears from the record : nor that Fant should have furnished the means of the bank to enable Hodge to take up the draft of March 30th, 1867, for $5,700, and should have taken his demand notes for the amount: nor that those notes should have been held so long by the bank, without any proceeding being had to enforce their payment, or without even any demand of such payment. "Why the di’aft of March 30th, 1867, was drawn by Fant, is fully explained in the record, and was well understood by Hodge. It was to prepare for the quarterly report of the condition of the bank, which Fant had to make on the 1st of April, and which was to be exhibited to the comptroller of the currency, and upon which might depend the important question, whether the bank should be any longer the depository and financial agent of the national government. It did not look well that this debt of Hodge was standing upon a mere unaccepted bill, drawn several months before, and ever since remaining in the hands of the drawee. And, therefore, Fant drew a bill at one day’s sight, wh'ch Hodge accepted and paid out of means of the bank furnished him by Fant, who, after the emergency was over, took the demand notes of Hodge for the amount, which wer¿ held by the bank until after Hodge’s death, and are the notes on which this action is founded. Hodge never *71 denied that the debt now claimed by the bank was due to it by somebody: never denied that the bank had paid the amount of the drafts of July 7, 1866, to the brick company, and had never been repaid the amount, or any part of it, by the brick company, or anybody else : never denied that he duly received these drafts enclosed to him in cashier Glover’s letter of July 18th, 1866 : never pretended that he had returned them,-or refused to accept or pay them : never pretended that he did not know the bank had paid the amount of them to the brick company, or that he believed they were placed in the hands of the bank for collection merely : never pretended that he did not know that, when the draft of March 80th, 1867, was drawn, the bank claimed to be his creditor for the amount of the two former drafts, and that the latter was drawn for that very debt. The only pretence he ever set up was, that after he had received the two drafts of July 7,1866, and before he accepted the draft of March 30, 1867, he had paid two drafts of the brick company, which, together with what he had paid before the drafts of July 7,1866, fully paid all that he owed to that company. How, if the brick company and the bank were the same corporations, or if Mr. Hodge had been the only stockholder in each of them, there might be some reason in this pretence. But as those corporations were not the same; as the stockholders in each were not the same; as there were other stockholders in the bank besides Mr. Hodge, whose interests are entitled to the protection which the act of incorporation was designed to afford, I think the pretence cannot be sustained. But it is said the bank ought not to have discounted or collected the two last drafts of the brick company on Hodge. But how could the bank know the state of accounts between Hodge and the brick company? And what had the bank to do with that matter ? Mr. Hodge ought to have known all about that matter, and he had a great deal to do with it. *72 His error was in paying these two last drafts, and this bas been the cause of his loss. It is painful for the C0Uldt0 reQder judgment in such a case, in which a heavy loss must fall on one or other of the parties, to neither °f whom is wilful wrong imputable. The law must determine bbe question on which of them the loss must fall. In this case, I think the law requires it to fall on the defendant, and the judgment must, therefore, be accordingly. That being the judgment of the court below, I think there is no error in it. ETor do I think the court below erred in overruling the motion of the defendant to set aside the verdict, and grant a new trial. I do not think the newly discovered evidence would or ought to have changed the result.
I am for affirming the judgment.
The other judges concurred in the opinion of Man-cure, P.
Judgment arrirmed.