SMITH v. LAWSON et al.

Decided June 25, 1881.

(*PATTON, J., Absent.)

1. Payment of a dishonored note by an endorser does not extinguish its negotiability as to him and all parties liable thereon to him. When an overdue note is transferred, the holder takes it subject to all the defences and equities, to which it was subject in the hands of his immediate endorser, whether or not he had any notice thereof; except that an accommodation note in his hands is not therefore invalid.

*Submitted before Judge P. took his seat upon the bench.

2. *Quære:* If the equities, to which such over-due note is subject in the hands of the transferee, are such equities as attach to the note itself, as illegality or want or failure of consideration or a release or payment only, or whether it includes all offsets.

3. By the endorsement or transfer by delivery, when payable to bearer, of a negotiable note, though after it is due, the legal title passes without notice to the maker, and therefore a payment to the assignor or transferrer, who no longer holds the legal title, is not a good payment, though the party making the payment had no notice of the assignment or transfer. The declaration on a negotiable note states the endorsement and delivery, as at the time of the making; and the proof is the delivery after the note fell due. HELD: This is no variance; and if it was, it could only be taken advantage of by a motion to exclude the evidence or a motion to instruct the jury to disregard it.

4. The cashier of a bank has *prima facie* the authority to endorse or transfer by delivery negotiable notes belonging to the bank, but the president of a bank has no inherent authority to endorse or transfer negotiable notes belonging to the bank, nor has any other officer this inherent power except the cashier.

5. The president of a bank may be authorized by the board of directors to transfer or assign negotiable notes belonging to the bank; and such authority need not be proven by showing that it was expressly conferred by the board of directors, but may be proven by showing the existence of such facts as constitute clearly a public holding out, that he was authorized to transfer or assign the notes belonging to the bank.

6. The inference, that such authority had been conferred, may be legitimately drawn from proof, that he was in the habit of doing acts of the same general character though applied to a different subject, and especially where such acts were the exercise of still greater power, as the assignment of other choses in action such as bonds or judgments; but such power could not be legitimately inferred from proofs, that he was in the habit of receiving deposits or payments of notes, or proofs, that he was authorized to receive generally deposits and payments made to the bank.

7. The board of directors of a bank may ratify or approve a transfer of a negotiable note of a bank, which has been made by the president without authority.

8. The acceptance and appropriation of the consideration, which was received, when the president without authority transferred a negotiable note belonging to the bank, is an implied ratification of his act, when such acceptance and appropriation is made by the directors of the bank, after they have been informed of the unauthorized act of the president—and if the acceptance of such consideration and its appropriation have been made by the officers of the bank without the knowledge of the directors, unless the directors return the consideration, when the receipt becomes known to them, the failure and the retention of the consideration by them will be a confirmation of the act of the president.

9. To recover on a negotiable note, the plaintiff need only prove, that he has the legal title thereto and is a *bona fide* holder thereof, by a transfer made to him, before it became due; and his right to recover in such a case cannot be defeated by proof, that the person, who transferred it to him, came by it wrongfully or had no equitable title thereto.

10. The holder of a note will be presumed to have received it before it was due, but it may be proven, that it was transferred to him, after it was due; and if it be so proven, he can have no better title than the party, who transferred it to him, and he may be defeated in a suit in such a case by proof, that the party, who transferred it to him, had no title to the note or had no right to transfer it.

11. If a note be transferred by an officer of the bank, who by virtue of his official business has a general authority to transfer such notes, in a suit on it by a *bona fide* transferee the authority of the officer of the bank to make the transfer can not be disputed by the defendant, when his only defence to the suit is the supposed want of title in the plaintiff.

12. The cashier's *prima facie* authority to transfer the negotiable notes of a bank will not make such transfer valid, if it be proven, that the transferee knew, that the transfer was made by the cashier not in the usual course of business and for an improper purpose.

13. The holder of a negotiable note, to whom it has been transferred for value by the president of a bank, who had not been authorized to transfer it, is not a *bona fide* holder of the note, and the maker of the note may dispute his title to it, when he brings a suit upon it.

14. Gross negligence in the receipt of a note may be evidence of *mala fides*, and as such may be received in evidence, but it does not of itself show *mala fides*, and the holder cannot be deprived of his right to recover, unless he acquired the note *mala fide*.

15. But if the holder acquired the note with a full knowledge of facts, which in law showed, that the party, from whom he acquired the note, had no authority to transfer it, he cannot be regarded as having acquired it *bona fide*, though under a misconception of the law he may have supposed, that the party, of whom he acquired it, had a right to transfer it to him.

16. Is the holder of a negotiable note received as collateral security for a previously existing debt such a *bona fide* holder, as to be free of all equities existing against the note in the hands of the person, from whom he received it?

17. An action on a negotiable note endorsed in blank may be maintained in the name of the holder, who is not the owner, by the owner's consent.

18. The mother-bank has a right to receive the payment of any debt due the branch, even though contracted with a branch-bank, as a negotiable note discounted by a branch-bank; and the mother-bank may authorize one of its own officers to receive payment of such a note or confirm the receipt of payment of such a note, if it had been previously done by such officer without express authority.

Writ of error and *supersedeas* to a judgment of the circuit court of the county of Kanawha, rendered on the 10th day of June, 1873, in an action at law therein pending, in which Benjamin H. Smith was plaintiff, and Anthony Lawson and James A. Nighbert were defendants, allowed upon the petition of said Lawson.

Hon. Joseph Smith, judge of the seventh judicial circuit, rendered the judgment complained of.

GREEN, JUDGE, furnishes the following statement of the case:

Benj. Smith as endorser of James A. Nighbert brought an action of debt in the circuit court of Kanawha county against Anthony Lawson, drawer, and James A. Nighbert, endorser, in 1866. The suit was based on a promissory note drawn by A. Lawson, payable to the order of James A. Nighbert for $2,578.50 dated June 28, 1861, payable and negotiable at the office of the Bank of Virginia, Charleston, Kanawha county, ninety days after its date, which note was endorsed by J. A. Nighbert. When the suit was instituted an attachment was issued against A. Lawson, the drawer, as a non-resident and levied on his farm in Logan county, West Virginia. But both of the defendants appeared in the suit and demurred to the declaration and pleaded payment. The demurrer to the declaration was overruled, there being no good ground on which it was based. The defendant, A. Lawson, filed three special pleas. The first was a plea, that this note, when it became payable, was the property of the president, directors and company of the Bank of Virginia, and that the said bank was, when said note became payable, justly indebted to him in the sum of $2,538.00 —for money deposited by him in the office of discount and deposit of said bank at Charleston, Kanawha county ; and that the said bank has been ever since and still is so indebted, which sum he thereby sets off against said notes. The second plea was substantially the same, except that it set out the manner, in which the bank became the owner of said note, that is, by discounting it. The last of these special pleas was, that, while the said note was the lawful property of the said bank, it was fully paid and satisfied to the said bank by the

defendant, Nighbert; and with this last plea was a bill of particulars setting out the deposit by James A. Nighbert in the Bank of Virginia, at Richmond, on January 24, 1865, to the credit of J. C. McFarland, president of the branch-bank at Charleston, to pay his note in part endorsed by A. Lawson (thereby meaning the note sued on) the sum of $3,100.00. To these special pleas the plaintiff replied generally.

The defendants also pleaded *nil debet*, and issue was joined. The defendants withdrew two other special pleas, which had been filed, and also the general plea of payment; and on June 15, 1878, the parties not desiring a jury in lieu thereof submitted the case on the issues joined to the court, who decided, that the plaintiff was entitled to recover of the drawer, Anthony Lawson, $4,388.90 and on the issue of *nil debet* decided in favor of the defendant, James A. Nighbert, and entered up a judgment in accordance with such finding. The defendant, Anthony Lawson, excepted to this opinion and judgment of the court; and the court certified all the evidence, on which such opinion and judgment were based. The judgment in favor of Nighbert, the endorser, was obviously based on the fact, that there was no proof, that this note had ever been protested. The evidence, on which was found the judgment against the drawer, A. Lawson, was the note itself signed by him and endorsed by James A. Nighbert corresponding with the description thereof in the declaration, and which has been given above. The defendants, to maintain the issue on their part, proved by James A. Nighbert, that on January 24, 1865, he paid $3,100.00 on this note in Confederate money, and as evidence thereof he produced this paper:

"BANK OF VIRGINIA,  }
"RICHMOND, January 25th, 1865. }

"$3,100.00.

"James A. Nighbert has deposited in this bank thirty-one hundred dollars, to the credit of J. C. McFarland, president branch-bank, at Charleston, W. Va., to pay his note in part, endorsed by H. Lawson, and payable without the return of this certificate.

"H. J. MILLER, *Teller.*"

The misdescription of the note in this certificate, he says, arose from his then thinking the note was drawn by him and

endorsed by A. Lawson, the note itself not being in Richmond. The proceeds of this note had been received partly by him and partly by A. Lawson, when originally discounted by the bank at Charleston, and he had forgotten, who drew the note; but it was the only note, which he and Lawson then owed the bank and was intended as the note sued on. The Confederate notes were then worth but little, forty to sixty dollars of them being worth one dollar in gold. They also proved by the plaintiff, B. W. Smith, that the note sued on was transferred to him by Isaac N. Smith to indemnify him as his security in a certain debt, which, since the suit was instituted, had been paid by the principal, Isaac N. Smith, who was now the real party, for whose use this suit was prosecuted; and by Isaac N. Smith they proved, that on January 1, 1864, the note sued on was transferred to him by James C. McFarland, president of the branch-bank of Virginia at Charleston, by the following written assignment:

"OFFICE OF DISCOUNT AND DEPOSIT OF BANK, VA.,}
"AT CHARLESTON, KANAWHA, January 1, 1864. }

"Isaac N. Smith this day presented at the office of the Branch-Bank of Virginia, at Charleston, to me as president of said Branch-Bank, having sole charge of its books, papers and assets, the sum of twenty-seven thousand one hundred and eighty-two ($27,182.00) dollars in bank notes, issued by the Bank of Virginia, of which said sum of $27,182.00, so presented to me by Isaac N. Smith as aforesaid, the sum of fifteen hundred dollars ($1500.00) was in notes payable at the aforesaid Branch-Bank of Virginia, at Charleston, the residue consisting of bank-notes issued by the Bank of Virginia, payable at Richmond and its various other branches. The said Isaac N. Smith as the holder of said notes demanded payment thereof; I informed Mr. Smith that this office had neither specie nor bank-paper current here, with which to pay and redeem the notes presented by him as aforesaid, and that nearly all of said notes being payable at the Bank of Virginia, at Richmond, and its branches other than that of which I had charge, I did not admit his right to present them here for payment, or the

obligation of this branch to redeem that class of notes, until its own liabilities had been first paid off and settled. He alleged that the assets of the said bank wherever situate were the common property of *"the President, Directors and Company of the Bank of Virginia,"* (under the laws now in force here a foreign corporation), and liable for their debts, and that unless the aforesaid notes of said Bank of Virginia, held by him and now presented, were paid, he would at once institute legal proceedings to attach and subject to their payment the entire assets of said bank in possession of its branch at Charleston, and within the jurisdiction of the courts, whether State or Federal, held in Kanawha county. At the same time, in order to avoid litigation, he proposed to receive in payment and discharge of the bank-notes, held and presented by him as aforesaid, an equal amount, dollar for dollar, in the discounted notes, bills of exchange and other securities for money held and negotiated by the said Branch-Bank of Virginia, at Charleston, he taking upon himself all risk and hazard, including the solvency of the parties or otherwise, the costs and difficulties of collection, and asking no right of recourse, except in the contingency it should be hereafter ascertained, that any of said securities had been or shall be hereafter paid to the bank.

"Without admitting as aforesaid the right of the said Isaac N. Smith to require or compel the branch-bank of Virginia, at Charleston aforesaid, to redeem the notes so presented by him as aforesaid, (except the said sum of fifteen hundred ($1,500) dollars, payable at its office aforesaid), until its own liabilities are first paid off and settled, after much serious consideration I have concluded to accept this proposition as the only alternative, and to avoid the litigation and other difficulties which might result from my refusal, verily believing that in this I am acting for the best interests of the bank under all the circumstances. Now, therefore, I, James C. McFarland, as president of the said Branch-Bank of Virginia, at Charleston, Kanawha county, as aforesaid, in consideration of the payment and delivery to me for the said bank of the sum of fifteen hundred dollars in the notes of said bank, payable at this office, and of the further sum of twenty-five thousand six hun-

dred and eighty-two dollars in the notes of said Bank of Virginia, payable at Richmond and its other branches, (making altogether the sum of $27,182.00, so presented to me by the said I. N. Smith as aforesaid, the payment and delivery of which by the said Isaac N. Smith is hereby acknowledged,) assign and transfer to him, the said Isaac N. Smith, the several notes, bills and other securities for money following, which are due to the said Branch-Bank of Virginia, at Charleston, and are unpaid by the parties thereto, a list or schedule of which is hereto subjoined and made part and parcel of this assignment, and amounting in the aggregate of principal, interest and costs to the sum of ($26,871.82) twenty-six thousand eight hundred and seventy-one 82-100 dollars, which, together with three hundred and ten 18-100 dollars bank-notes returned, make up the above sum of $27,182.00, together with the evidences of protest, so far as the same are in my possession accompanying the same, and the benefit of any lien which the said bank may hold or have acquired to secure the payment of any of said several notes, bills or other securities. But this transfer and assignment is made by the said James C. McFarland, as president as aforesaid, and accepted by the said I. N. Smith, with the express condition and understanding that the said I. N. Smith, and his assigns, are to have no recourse or right of action against the Bank of Virginia, or the Branch Bank of Virginia, at Charleston, or against myself, either in my official character and capacity as president of said branch-bank, or against me personally and individually, or against any director of said bank, for any costs, damages or loss which he or they may incur in endeavoring to secure or collect said notes, bills or other securities hereby assigned, or any part of them, or any part thereof; or for an account of his or their failures to secure or collect the same, or for any other cause growing out of or resulting from this assignment, save and except that in the event it shall hereafter appear that any of said notes, bills or other securities hereby assigned have been or shall hereafter be paid to the bank, either in whole or in part, the

said bank shall be liable to make good to the said Isaac N. Smith, or his assigns, the loss occasioned thereby.

| Debtors. | Endorsers. | Principal | Interest | Total. | Remarks. |
|---|---|---|---|---|---|
| John Hall ......... | J. M. Laidly and T I Buster............. | $ 702 67 | $105 40 | $ 808 07 | |
| John Hall........... | J. M Laidly.. ....... | 792 52 | 118 87 | 911 39 | |
| S. H. Miller....... | A. W Quarrier and Geo. W Summers | 1,262 60 | 214 64 | 1,477 26 | |
| John W. Fie'd .. | A W. Quarrier ... | 30 00 | 4 55 | 34 55 | |
| N. V. Wilson ... | Chas Ruffner......... | 2,102 51 | 325 88 | 2,428 39 | |
| J. F Hansford | F. G. Hansford ...... | 2,502 53 | 387 89 | 2,890 42 | |
| A. P. Sennett ... | A. B. L ttlepage...... | 890 03 | 219 97 | 1,110 00 | Note on its face for $1850, but reduced by credits. |
| A. Duling......... | W. Eastwood.......... | 773 50 | 142 63 | 916 13 | Note for 1,002 50, and reduced by credits. |
| Jno. Truslow..... | W. Hedrick............ | 500 00 | | | |
| Same.......... | Same............ ......... | 700 00 | 172 00 | 1,372 00 | |
| D. Shrewsbury.. | Jno. McConihay...... | 1,456 05 | 50 96 | 1,507 00 | Note for $3500 but reduced by credits. |
| F. Thompson.... | G. W. Thompson.... | 2,000 00 | 195 00 | 2,195 00 | Some interest paid, and credited. |
| I. B. Noyes ...... | Harriet Noyes......... | 202 55 | 11 00 | 213 55 | Some int. p'd and cred'd. |
| Same................ | Same ..................... | 350 00 | 29 16 | 379 16 | " " " " |
| T. L. Bronaugh | Snell W. C. Brown | 402 65 | 61 10 | 463 75 | |
| I. G. Paxton..... | C. P. Huddleston.... | 242 66 | 39 34 | 282 00 | |
| A Lawson.. ...... | Jas. Nighbert........ | 2,578 50 | 368 00 | 2,946 50 | |
| Jas. L Carr, ⎫ J. G. Carr, ⎬ ... W. Hedrick ⎭ | | 5,008 35 | 720 65 | 5,729 00 | Judgment. |
| Jos. Shields, ⎫ C.D Slaughter ⎰ | | 232 66 | 32 88 | 265 54 | Judgment. |
| Jno. L. Vickers, Geo. H. Warth, Job English,..... | | 527 80 | 414 32 | 942 12 | Judgment. |
| | | | | $26,871 82 | |
| By bank notes returned to balance.................................... | | | | 310 18 | |
| | | | | $27,182 00 | |

"JAMES C. McFARLAND,

"*As President of the Branch-Bank of Virginia, at Charleston.*"

As this assignment was first drawn the clause of the first paragraph read: "Except in the contingency it should be hereafter ascertained, that any of the said securities had been paid to the bank previous to their being transferred to him." It was changed by the parties to the words above given. At the close of the second paragraph the words originally were: "and have been paid to the bank either in whole or in part previous to the date of this assignment," which were changed by the parties to the present form. The changes were all made before the signing of the assignment.

They also proved by Goshorn and Gillison, that they were directors of the Branch-Bank of Virginia at Charleston at the breaking out of the war in 1861, and that no directors were ever after either elected or appointed for said Branch-Bank; that this assignment made by McFarland was not authorized

or directed by the Board of Directors of the said 'Branch-Bank; and that Gillison objected to this assignment and advised McFarland not to make the same.

The plaintiff in rebuttal proved, that the Board of Directors of this Branch-Bank, shortly after the late civil war commenced, ceased to meet or act as such Board of Directors, and no meeting of this Board was held after 1861; that Gillison in the early part of that year refused to act as such director thereafter and did not so act; that after McFarland concluded to make the above assignment Gillison was present and assisted in making the calculations and in preparing the paper. The plaintiff further proved, that the money, property, notes, books and assets of said Branch-Bank were in the sole charge, custody and control of said McFarland—from the time the Board of Directors ceased to act in 1861 until the time of his death in November, 1864. Plaintiff also produced and proved a letter written to James C. McFarland by James Caskey, who was at the date of the letter the president of the Bank of Virginia at Richmond, which letter was accompanied by a letter written to Mr. McFarland by Wm. F. Taylor the cashier of the Bank of Virginia at Richmond; but this last letter was not produced or its contents proven. The first letter from James Caskey was as follows:

"BANK OF VIRGINIA, ⎫
"RICHMOND, October 18, 1862. ⎰

"It is a long time since the Bank here has paid out any bank-notes. The receipts are altogether C. S. and Va. tr. notes, which is now and must be for a long time the currency of the country. You can only pay your depositors in such funds as you receive, and of course you will not refuse to take payment in the currency of the Confederate States of any debt due to you. There was no election or appointment of directors for your office last January. It was thought best to pursue this course, as then those in office by law continued to be the directors until their successors are appointed. We hope you will be with us or have some one to represent you here next January.                                  ·J. C."

Upon this evidence, which was all the material evidence in the case, the court rendered a judgment in favor of the plaintiff against the defendant, A. Lawson, for the amount of the

note, interest and costs.    From this judgment he has obtained
from this court a writ of error and *supersedeas.*

*James H. Ferguson* for appellant:

I. *The assignment of the note in question by J. C. McFarland
to I. N. Smith, was without authority on his part, and passed no
title to the note to Smith.*

*First.* His official position as president of the branch-bank
at Charleston gave him no such authority.

Angell & Ames on Corporations, section 299.

*Second.* The special authority, if it amounted to anything,
given him by the letter of the parent-bank at Richmond gave
him no power to make the assignment in question.

II. *I. N. Smith having no title to the note himself could convey
none to the plaintiff.*

But it is unnecessary to discuss this point, as the plaintiff
himself proves, that the debt, for which the note had been de-
livered to him as collateral security, had been paid, at the
time of the trial, and that the suit was being then prosecuted
for the benefit of I. N. Smith.

III. *But even if McFarland did have authority to make the
assignment of the note in question, the rights of I. N. Smith ac-
quired thereby are those of an assignee of a non-negotiable note,
and not those of an endorser of a negotiable note.*

IV. *In any view of which the case is susceptible it was error
to give judgment for the plaintiff, without allowing the credit for
the payment made in Richmond.*

*Smith & Knight,* for appellee, cited the following authorities:
14 Gratt. 1; 20 Gratt. 457; 26 Gratt. 785; 4 W. Va. 648;
3 Mason, 505; 8 Wheat. 361,362; 4 Mich. 606; 1 Smed. &
M. 241; 6 Porter 166.

GREEN, JUDGE, announced the opinion of the Court:

If we assume, that James C. McFarland, the president of
the Branch-Bank of Virginia at Charleston, had authority to
make the assignment on January 1, 1864, of the note sued on
in this case; and that on January 25, 1865, H. J. Miller, the
teller of the Bank of Virginia at Richmond, had authority to
receive payment of this note, then the record in this case shows

substantially, that on June 28, 1861, Anthony Lawson made his note negotiable and payable at the office of the Branch-Bank of Virginia at Charleston ninety days after its date for $2,578.50 payable to the order of James A. Nighbert. It was endorsed by him and at once discounted by the Branch-Bank of Virginia at Charleston for the accommodation in part of the drawer and in part of the endorser. When it matured it was not protested, though not paid, the war preventing its protest; and after the close of the war it was not protested. Some two years and three months after this note became due, it being in the possession of James C. McFarland, the president of the Branch-Bank of Virginia at Charleston, it with a number of other notes was assigned by him, we will for the present assume, by proper authority of "The president and directors of the Bank of Virginia," to whom it belonged, to Isaac N. Smith for a valuable consideration and was delivered to said Isaac N. Smith without any endorsement on it except the blank endorsement of the payee, J. A. Nighbert.

About one year thereafter James A. Nighbert, the endorser, paid on this note by a deposit in the Bank of Virginia at Richmond to the credit of J. C. McFarland, the president of the branch bank of Charleston, W. Va., $3,100.00, which was received by R. J. Miller, the teller, as we will for the present assume, by proper authority as a payment on this note, though by mistake the note was stated by Nighbert to have been drawn by him and endorsed by Lawson. When this payment was made, the drawer and endorser believed, that it was still owned by "the president and directors of the Bank of Virginia," and that it was still in the possession of J. C. McFarland, the president of the branch bank at Charleston. Isaac N. Smith afterwards transferred this note to B. H. Smith, the plaintiff, as collateral security to indemnify him for moneys he had paid as the security of Isaac N. Smith; but after the suit was instituted, this money was repaid by Isaac N. Smith, and the suit was thereafter for his benefit.

Assuming for the present, that this note was legally transferred and deliverd to Isaac N. Smith for a valuable consideration and afterwards paid off to the authorized agent of "the president and directors of the Bank of Virginia" without notice of this transfer to Isaac N. Smith, the plaintiff had a right

to recover in this suit the whole amount of this note. This is in effect decided in *Davis* v. *Miller*, 14 Gratt. 1.

In this case the negotiable note was made by Davis payable at the Exchange Bank of Richmond to Fant & Co., who endorsed it, and it was discounted by the bank for Davis's accommodation. It was not paid at maturity, and was protested, and then Fant & Co., the endorsers, paid the note to the bank, and it was tranferred and delivered to them and was then delivered to Miller and Mayhew as security, for the payment of a debt, and they brought suit upon it against the maker, Davis. He pleaded *nil debet* and payment and proved, that two days after the note had been transferred and delivered to Miller & Mayhew, he paid the note to the payee and endorser, Fant & Co., without any notice, that they had transferred it, and that it was not transferred by them for more than a month after it matured for payment. It was held, that this payment did not constitute a defence. From that case it appears, that a negotiable note can be transferred as well after as before it becomes due, though the rights of the transferee will be very different in the two cases. In the case of a transfer of a note before it becomes due to a *bona fide* holder for value he will take it free of all equities between antecedent parties, of which he had no notice. But in the case of a transfer of an over-due note the holder will take it as a dishonored note subject to all the defences and equities, to which it was subject in the hands of his immediate endorser, whether he has any notice thereof or not. In such a case he will receive nothing but the title and rights of such endorser, except that if it be an accommodation note, which, though endorsed after it was due, gives to the endorsee a right, though the endorser, under whom he claims, might have none.

There has been much controversy as to the question whether, when an over due negotiable note is endorsed, the endorsee takes it subject to all the offsets, to which it was liable in the hands of his immediate endorser, or only to such equities as attach to the note itself, as illegality or want or failure of consideration. But be this as it may, it was expressly decided in that case, that offsets acquired or payments made after the endorsement of an over-due note, though the offsets were acquired or payments were made before notice of the endorse-

ment, constitute no defence as against the endorsee. The reason assigned for this by Moncure, Judge, is, that "the law-merchant, which is a part of our law, has made certain paper negotiable. The payee or person legally entitled to it may pass the legal title to another; and the title of that other is just as perfect, as if he had been the original payee; or just as perfect, as would be his title to any other kind of property legally transferred to him. It follows, that after the transfer payment can only be made to him; and if made to another, would be a payment in the payer's own wrong or at his risk. To say, that a payment made to the endorser without notice of the transfer is a good payment, is to beg the question, or is in effect to say, that such notice is necessary to pass the legal title. If it were necessary, to pass the legal title, then it would follow, that payment to the endorser before notice of the endorsement would be a good defence against the endorsee. But if it be *not* necessary, to pass the legal title (and it is not), then it follows, I think, as clearly, that such a payment is not a good defence against the endorsee."

Judge Moncure then proceeds to show, that endorsement and delivery with intent to pass the property is a complete transfer of the legal title of a negotiable note. *Lloyd* v. *Howard,* 69 Eng. C. L. R. 995. So far as the transfer of the legal title is concerned, such an endorsement and delivery of a negotiable note for such purpose is just as effectual, when ·the note is over-due, as when it is made before the maturity of the note. The conclusion he reaches is: ".The legal title to negotiable paper may be transferred without value, whether before or after maturity; and in either case the endorsee takes it subject to all equities then existing, but not to matters of defence accruing afterwards between the first parties." See *Davis* v. *Miller* 14 Gratt. 17. It is therefore clear, that if McFarland, the president of the branch-bank of Virginia at Charleston, had the legal right to transfer the legal title of the president and directors of the Bank of Virginia to the note sued on, then such transfer having been actually made for a valuable consideration, though years after the note was over-due, the plaintiff in this suit would have a right to recover the full amount of the note of the maker, though a year after the transfer without notice thereof the note was paid to the presi-

dent and directors of the Bank of Virginia by the maker or endorser.

The counsel for the plaintiffs in error insists, that even if the authority of McFarland as president of the Branch-Bank of Virginia at Charleston to transfer the note in this case is admitted, this case is distinguishable from the case of *Davis v. Miller*, 14 Gratt. 1, in several important particulars, and that the decision in that case ought not to govern in this case. "In the first place," he says, "the note in that case was duly protested, and thereby the liability of the endorser was continued. Not so in this case. Secondly, the note in that case was paid and taken up by the payee and endorsers. Not so in this case." If the question was whether the endorser was responsible there would be important differences, but as the maker only was held responsible in the case before us, I can not see that these differences are in any respect material. The third difference pointed out by the counsel of the plaintiffs in error is, that the note was in that case endorsed by Fant & Co., the legal owners and holders of the note, to Miller & Mayhew, the endorsees. Here it is claimed that the president and directors of the Bank of Virginia, the legal holders and owners of the note, did not endorse it to Smith; but even if McFarland had authority to transfer the note, yet the transfer was not made by an endorsement but by a written assignment on a separate paper, and therefore, it is claimed, Smith could claim only as assignee and not as endorsee or legal owner of the note.

This is a distinction without a difference. The endorsement by James A. Nighbert, the payee in this case, was in blank; and the re-endorsement made the holder of this note the legal owner thereof. That is, the legal title to the note, so long as this blank endorsement was on it, passed with the delivery of this note to every *bona fide* owner thereof; and, if McFarland had authority to transfer and deliver this note conferred on him by the owners thereof, then his delivery thereof transferred the legal title of the note to Smith, and he had a perfect right to write over the endorsement of James A. Nighbert: "Pay to the order of Isaac N. Smith," thus making a formal legal transfer of the note. This under such circumstances was unquestionably his right; and as his legal title

was complete, if McFarland had a right to transfer this note by the mere delivery of the note to him, it is obvious, that such legal title would not be destroyed by the mere fact, that there was also an independent paper or assignment executed by McFarland. But this paper may, as we will presently see, be important in determining, whether McFarland had authority to transfer this note, and also in determining, whether he "delivered it with intent to pass the property;" for if he had such authority, such delivery is, as we have seen, a complete transfer of the legal title to this note and rendered payment afterwards to any but the legal owner of no avail.

It thus becomes a question of first importance, whether McFarland, the president of the Branch-Bank of Virginia at Charleston, had authority to transfer this note owned by the bank. The cashier is the chief executive agent of a bank and as such has by virtue of his office large powers. Among them he has full charge, control and power of disposition over the personal property of the bank such as specie, negotiable notes or bills. It has been held, that he has not the power without special authority to transfer a negotiable promissory note of the bank to a third party. See *Hallowell and Augusta Bank* v. *Hamlin et al.*, 14 Mass. 180; *Hartford Bank* v. *Barry*, 17 Mass. 97. In *Farrar* v. *Gilman* 19 Me. 441, the correctness of this position was regarded as questionable; but it may be now regarded as settled, that the cashier of a bank has *prima facie* authority by virtue of his office to transfer negotiable promissory notes belonging to the bank in the transaction of the usual business of the bank, and his transfer of such a note to a party, who receives it in good faith, confers a valid title to the note on the transferee. See *Wild* v. *The Bank of Passamaquoddy*, 3 Mason 505; *The Bank of the State* v. *Wheeler*, 21 Ind. 90; *City Bank* v. *Perkins*, 29 N. Y. 554; *Cooper* v. *Curtis*, 30 Me. 488; *Kimball* v. *Cleveland*, 4 Mich. 606; *Crockett* v. *Young*, 1 Smeade & M. 241; *Everett* v. *United States*, 6 Porter 166; *Bridenbeck* v. *Lowell*, 32 Barb. 9; *Fleckner* v. *United States Bank*, 8 Wheat. 357; *Bobb* v. *Ross County Bank*, 41 Barb. 586; *Harper* v. *Calhoun*, 7 How. (Miss) 203; *Lafayette Bank* v. *State Bank*, 4 McLean 208.

But if the transfer by the cashier of a bank of one of its negotiable notes was proven to have been made to a third person

in a transaction, which was plainly out of the usual course of business, and the transaction on its face showed, that the transferee must have known, that the cashier was assuming a power and transacting business outside of his duties as cashier and was transferring a negotiable note of the bank for a purpose, for which he as such cashier had no right to transfer a negotiable note belonging to the bank, such transfer would be regarded as unauthorized, and the transferee could not be held to be a *bona fide* holder, even though he did give a valuable consideration for the note. See *Everett* v. *The United States*, 6 Porter 181 ; *The Bank of the State* v. *Wheeler*, 21 Ind. 94 ; *City Bank* v. *Perkins*, 29 N. Y. 554. And this great power and authority is possessed by no other officer by virtue of his office. It is not even possessed by a clerk, who is acting as cashier in the temporary absence of the cashier, though such acting cashier would have power to do all such acts, as were necessary to carry on the usual business of the bank, such as to pay checks and receive payment of notes and deliver them to the persons entitled to them. See *Potter* v. *The Merchants Bank*, 28 N. Y. 650.

It is true that in *Leavitt* v. *The Connecticut Peat Company*, 6 Blatchf. C. C. 150, the president of the Connecticut Peat Company transferred a note belonging to the company to a director of the bank, and Shipman, Judge, held the transfer invalid and put it on the ground, that the defendant was in a position, in which he ought to have known, that the president had not authority to transfer a negotiable note of the company by its by-laws, and did not put it on the broader ground, that the president of the company had not by virtue of his office power to make such transfer, as he might well have done ; for as such president he would have had no more authority to make such a transfer than the president of a bank, and it has been decided, that the president of a bank has no such authority by virtue of his office. See *Gibson et al.* v. *Goldthwaite*, 7 Ala. 293 ; *Hoytt* v. *Thompson et al.*, 1 Selden 335. Indeed the spirit of the decisions generally shows, that the inherent powers of a president of a bank are very limited ; and it has been said, that the entire collection of judicial decisions justifies the annunciation of only one act as falling within the proper inherent power of the president. This

solitary power is to take charge of the litigation of the bank, employ counsel in suits against the bank, institute suits in the name of the bank and appear and defend suits against the bank. See *First National Bank of Wellsburg* v. *Campbell and Henry Kimberland,* 16 W. Va. 555; *Hodge's ex'r* v. *First National Bank of Richmond,* 22 Gratt. 58.

It is true, that the president of a bank or any one else may be authorized to endorse or transfer its negotiable notes; and it is also true, that such authority need not be proven by showing, that it was expressly conferred by the board of directors, but it may be proven by the existence of such facts, as constitute clearly a public holding out that the endorsement or transfer of the negotiable notes of the bank by the president was within the scope of his legitimate delegated authority. The inference, that such authority has been conferred, may be legitimately drawn by proving, that he was in the habit of endorsing or transferring negotiable notes of the bank or of other *choses* in action of any other character, such as bonds and mortgages. The transfer and disposition of *choses* in action other than mercantile paper would be the exercise of a power of a similar and more comprehensive character; for the cashier of a bank has no authority to dispose of or transfer by virtue of his office *choses* in action of the bank other than mercantile paper, though, as we have seen, he does possess inherently the power to dispose thus of mercantile paper. See *Barrick* v. *Austin,* 21 Barb. 241; *Holt* v. *Bacon,* 25 Miss. 567.

But it is also true, that it could not be legitimately inferred from his habit of receiving deposits in the bank or his receiving payment of its negotiable notes, that the power to dispose of or transfer a negotiable note had been conerred on the president of a bank; for this would be the exercise of an entirely different sort of power, and one much more limited in its character. Thus the clerk of the cashier of a bank in his temporary absence may receive deposits or payments of notes, but cannot dispose of or transfer the negotiable notes belonging to the bank (*Potter* v. *Merchant's Bank,* 29 N. Y. 641), there being, as pointed out in that case, a marked difference between these two powers. Of course the directors of a bank may ratify the disposal or trans-

fer of a negotiable note belonging to the bank by its president; and the receipt by the directors of the consideration, on which such a transfer of a negotiable note belonging to the bank by its president, when this consideration had been received by the president for the bank without their authority, would be regarded as impliedly confirming his action, if it were shown that the directors were afterward notified or became acquainted with the action of the president, and they failed to return the consideration to the transferee of the negotiable note.    These principles are fairly deducible from the case of the *First National Bank of Wellsburg* v. *Campbell and Henry Kimberland*, 16 W. Va. 555; *Merchants Bank* v. *State Bank*, 10 Wall. 604; *Hodge's ex'r* v. *First National Bank of Richmond*, 22 Gratt. 69.

Applying this law to the facts in this case, it is obvious that James C. McFarland, the president of the branch-bank of Virginia, had no power *ex officio* as such president to transfer the note sued on and a large number of other negotiable notes to Isaac N. Smith in consideration of the surrender of notes of the Bank of Virginia, most of which were not payable at the branch-bank of Virginia at Charleston, and which therefore, that bank was not then bound to redeem ; and it is not pretended, that any express authority to make such transfer had ever been conferred on him.    The only question is, whether the implied authority to make such transfer could be legitimately inferred from the facts proven in this case.

On this point the material facts proven were, that there had been no meeting of the board of directors of the branch-bank of Charleston since 1861; that there was no cashier of that branch-bank there may be inferred from the evidence; that the money, property, notes, books and assets of the said Branch-Bank were in the sole charge, custody and control of said McFarland, and had been ever since 1861, and they continued in his possession till November, 1864, when he died; that more than two years before this transfer was made, a letter had been written to said McFarland by the president of the bank at Richmond informing him, that they had long ceased to pay out any of their bank-notes; that all their receipts were in Virginia treasury notes, and that he could pay the depositors in the branch-bank of Charleston in this sort

of currency and could receive payment in like currency of debts due the branch-bank at Charleston. This letter was accompanied also by a letter from the cashier of said bank. These were all the material facts on this point except those stated on the face of the assignment of these negotiable notes.

The assignment on its face states, that Isaac N. Smith on that day, January 1, 1864, presented to said McFarland, as president of said branch-bank, having sole charge of its books, papers and assets, $27,182.00 in bank-notes issued by the Bank of Virginia, of which sum $1,500.00 were in notes payable at the branch-bank at Charleston; and all the rest of these notes were payable at the bank in Richmond or at other branches. Smith demanded payment of these notes. McFarland denied Smith's right to demand the redemption of these notes at that branch, and said he had not the means of redeeming them either in specie or bank-notes. Smith claimed, that the assets of the bank, wherever situate, were the common property of "The president and directors and company of the Bank of Virginia," and that it was then a foreign corporation in West Virginia, and unless these bank-notes were redeemed, he would attach all the assets of the branch-bank of Virginia at Charleston and subject them to the payment of these bank-notes. To avoid litigation he proposed to receive in discharge of these bank-notes an equal amount in discounted notes, bills of exchange and other securities belonging to the bank and discounted by the Branch-Bank at Charleston, the same to be transferred without recourse. Without admitting the justice of this demand McFarland concluded, that it was the best, which could be done for the bank; and it was done. The $27,182.00 of these bank-notes were delivered by Smith to McFarland; and he assigned and transferred to Smith negotiable notes belonging to the Bank of Virginia and discounted by the branch-bank at Charleston, amounting to $26,871.82, and returned him, to make the two square, $310.18 in bank-notes. Among these notes so transferred was the note sued on in this case.

The assignment was without any sort of recourse, except "that in the event it should thereafter appear, that any of said notes assigned have been or *shall hereaftor be paid* to the bank in whole or in part, the bank should be liable to make good

to Isaac N. Smith the loss thereby sustained.    This assignment was signed by *James C. McFarland as president of the Branch-Bank of Virginia at Charleston.*    There was no proof that the president was in the habit of transferring the assets of the bank, or that he ever did so but in this single instance.    It may be inferred from this evidence, that when this assignment was made, the Branch-Bank of Virginia at Charleston had been closed and had ceased to do regular business for more than two years.    On some of the notes transferred judgment had been rendered, as appeared by the face of this assignment. None of the notes were endorsed ; but they were transferred by delivery only.

From these facts can it be legitimately inferred, that Mc-Farland was authorized by the Bank of Virginia to transfer and assign these notes and these judgments in favor of the Bank of Virginia to Isaac N. Smith in redemption of bank-notes, nearly all of which were payable at other branches or at the bank in Richmond ?    It is but a reasonable inference under the circumstances to infer, that the letter written by the president of the bank at Richmond accompanied, as it was, by a letter from the cashier to James C. McFarland, on October 18, 1862, was written with the knowledge and approbation of the directors of the bank at Richmond, and as there were not and had not been any directors of their branch-bank at Charleston for eighteen months, they had a right to give directions to the president of that branch.    The question, whether James C. McFarland had authority on July 25, 1863, to receive payment of a negotiable note, which had been discounted by the branch-bank of Virginia at Charleston, was presented to this Court in *Parker et al.* v. *Donally et al.,* 4 W. Va. 648.    The facts bearing on this question were substantially the same as those appearing in this record, including this letter of October 18, 1862.    This Court decided, that he had such authority.    But, as we have seen, we cannot legitimately infer from his having authority to receive deposits and payment of notes of the bank, that he had authority also to transfer and assign its notes, the two powers being essentially different.

The circumstances of this case do not show, that this assignment of McFarland of the assets of the bank was ever con-

firmed by the board of directors of the bank, or ever even communicated to them.    There was no board of directors of the branch-bank at Charleston; and there is no proof, that the board of directors of the bank at Richmond were ever informed, that this assignment had been made.    On the contrary it appears quite probable, that the board of directors of the bank at Richmond were never informed of, and therefore never could have affirmed, this assignment and transfer by McFarland of this note.    It is obvious that the officers of the bank at Richmond had never heard of this assignment on January 25, 1865, more than a year after the transaction; for on that day they received payment of this note at the bank in Richmond, evidently regarding it as still owned by the bank. McFarland was then dead, and the bank of Richmond or its officers could only have received information thereafter of the transaction in this note from Isaac N. Smith while the war was pending, and though he was a witness in the case, he did not prove that he ever gave such notice or information to them.    Nor can we under the circumstances infer, that the board of directors obtained this information on the close of the war, because we must infer, that the result of the war must have utterly broken the bank, as they appear by the record to have received during the war Confederate notes in payment of debts due them, and these notes, when the war closed, were utterly valueless.    We could not therefore assume, that there were regular meetings of the board for the transaction of ordinary banking business after the close of the war, or that anything was done after the close of the war except to wind up its business and distribute the assets of the bank remaining among its creditors.    Nor is there anything in the record to justify the inference, that even this was done by the board of directors; and the probability is, that it was not, but that it was done by some trustee or court.    There is therefore nothing which justifies the inference, that this transfer by McFarland was ever confirmed by the board of directors of the bank, or even ever made known to them; and we must therefore regard it as unauthorized.

It is claimed, however, that it was decided by this court in *Parker* v. *Donally et al.* 4 W. Va. 648, that under circumstances substantially the same as proven in this case James C.

McFarland, the president of the Branch-Bank of Virginia at Charleston, had authority to assign and transfer the negotiable notes, which had been discounted by this branch-bank. I do not so understand that case. In that case Isaac N. Smith paid a negotiable note of a third party belonging to the Bank of Virginia, and which had been discounted at the Charleston branch of the bank. The court decided, that McFarland was authorized to receive this payment, which point was the one in dispute in that case; and because Smith had paid this note to the bank, and it appeared, that it was done at the written request of the parties who owed the note, and it was expressly understood, that while the note was paid, so far as the bank was concerned, it was not to be considered as paid, so far as the other parties to this note were concerned, but that the benefit of the note and a deed of trust given to secure it should inure to Isaac N. Smith, who had thus paid this note at the request of the parties. This court held also, that this note was not extinguished in the view of a court of equity, but that it ought in equity to inure, together with the deed of trust, for the benefit of Smith. Even had there been no assignment of the note by McFarland to Smith, the payment of it by Smith under these circumstances would have entitled him, I think, to the benefit of this note and deed of trust to secure it, upon the principles laid down in *Neely* v. *Jones*, 16 W. Va. 625, and in the case of *McClaskey & Crim* v. *O'Brien et al.*, 16 W. Va. 91; and the authorities in this last case cited.

It is true, that in the case of *Parker et al.* v. *Donally et al.* there was a formal assignment of the note, which Smith had paid, by McFarland to him at the same time, that it was paid. But it was not this assignment, that gave a right of Smith to this note, but the fact that he had paid this note at the request of the parties, who owed it, and with an express understanding, that he should have the benefit of the note and deed of trust to secure it. There is certainly nothing in this case, which would justify the conclusion, that McFarland had a right to dispose of any of the assets of the bank at his pleasure. With reference to his authority all, as I conceive, that is decided by that case is, that he had a right to receive for the bank the payment of this note. From this fact is decided the right of Smith to the note and deed of trust to secure its payment in

the view of a court of equity, because there was an understanding between all the parties, that he should have this right, at the time he paid the note.

In the case before us Smith did not pay the note sued on to the bank, but on the contrary he bought it of the president of the bank, (McFarland), who assigned and transferred it to him. And the president, we have seen, had no authority to sell, assign or transfer this note.

But it is claimed, that Isaac N. Smith was a *bona fide* holder for value of this note, transferred to him by McFarland, and that the maker of a negotiable note cannot require of the plaintiff in any case more than to prove, that the note was payable to bearer or endorsed in blank, and that he, the plaintiff, became the *bona fide* holder of it for value. Thus it is claimed, that if such a note be lost or stolen, and the finder or thief transfer it for value to a *bona fide* holder, he may sue the maker on it, and he will not be permitted to controvert the right of the finder or thief to transfer the title. This is certainly true, if the note was transferred before maturity; (see *Murray* v. *Gardner*, 2 Wall. 110). But it is not true, if it were transferred after maturity. (See *Arents* v. *Commonwealth*, 18 Gratt. 773). The general rule is true, as claimed, when the note was transferred before maturity; but there is, it would seem, even then an important qualification to it, that is, though the defendant could not rely in such a case on the sole defence, that the *bona fide* holder of the note had acquirred it from one not authorized to transfer it, yet if the defendant by this unauthorized transfer of such a note is deprived of a *bona fide* defence, which he could have made but for such unauthorized transfer, he will be permitted to dispute the authority of the transfer, as under such circumstances he has a direct interest in this question; and it would seem, that he ought not to suffer by the unauthorized act of a party. If he must suffer by such unauthorized act, or the *bona fide* holder of the note for value must suffer, it would perhaps be more equitable to throw the loss on the *bona fide* holder for value in such a case, as his equity is the junior in point of time.

Was Isaac N. Smith then a *bona fide* holder of the note sued on in this case? It is now settled, both here and in England, that even gross negligence on the part of a holder of a nego-

tiable note in the receiving of it does not impair his title, if he nevertheless acquired it *bona fide*. At one time, it is true, it was held, that though the *bona fide* holder for value had acquired a note, yet if in acquiring it he was guilty of *gross negligence* and took the note or bill under circumstances which ought to excite the suspicions of a prudent man, his title would be thereby affected. *Crook* v. *Josler* 5 B. and Ad. (27 Eng. C. L.) 909. But it has been since held, and is now settled law, that while gross negligence might be evidence tending to show *mala fides*, and as such admissible, yet it does not of itself necessarily show *mala fides*, and without *mala fides* the holder cannot be deprived of his right to recover. See *Goodman* v. *Harvey*, 4 Ad. & El. 870; *Hamilton* v. *Vought*, 34 N. J. L. 187; *Murray* v. *Lardner*, 2 Wall. 110.

But the protection given a holder of a negotiable note or other mercantile paper can not be carried further. If the holder of such paper, when he acquired it, knew such facts as in law established, that the person, from whom he obtained the paper, had no legal right to transfer it, he must be regarded as having obtained it in bad faith, though he may have acted honestly in the acquisition, and from a misapprehension of the law supposed, that the person, from whom he acquired the note, had a legal right to transfer it. The Roman maxim *ignoratia legis excusit neminem* must apply in such a case. He must therefore under the circumstances be regarded as having obtained the negotiable note from one, who, he knew, had no right to transfer it, and therefore to have obtained it *mala fide*.

Isaac N. Smith knew, when this note was transferred to him, the facts, which, as we have shown, established that McFarland had no legal right to transfer the note. He acquired the note from one, who, he must be conclusively assumed to have known, had no right or authority to transfer it to him; and therefore no matter how honestly he may have believed, that under these circumstances the law would sustain the transfer, he must nevertheless be held to have acquired this note *mala fide;* and such a transfer can not operate to divest the title of the president and directors of the Bank of Virginia, to whom the note belonged. See *Gibson* v. *Goldthwaite* 7 Ala. 293.

Even had this note been transferred to Isaac N. Smith by the cashier of the branch-bank of Charleston instead of by its president, if the transfer had been for the purposes and under the circumstances, under which this transfer was actually made, on the authorities above cited in reference to the inherent power of a cashier of a bank, I think, it must have been held, that the note was not acquired by Isaac N. Smith in good faith.    For though the cashier has the inherent power and authority *prima facie* to transfer the negotiable notes of a bank, yet this *prima facie* inherent power may be shown by evidence, as I understand these decisions, not to exist by proving that the transfer was not in the usual course of business, but was made in the course of and the carrying out of a transaction, which the transferee knew was beyond the power of the cashier and entirely disconnected with his legitimate duties.

The transfer in this case was made to redeem a large number of the circulating notes of the bank, not issued by this branch-bank and not redeemable by it.    With the redemption of most of these bank-notes the cashier, and much more the president of the · branch-bank at Charleston, had nothing to do.    It was not the duty of this branch-bank to redeem them, and therefore it must in law be assumed, that Isaac N. Smith knew, that the cashier had not the authority to transfer the negotiable notes belonging to this branch-bank to redeem the bank-notes of the mother-bank on their face redeemable only at Richmond and other places.    The written assignment showed on its face, that the president knew it was outside of his official duty to so redeem these bank-notes, and doubtless the cashier must have regarded it as outside of his official duty.

Smith received this and a large number of other negotiable notes belonging to the bank in redemption of these bank-notes payable in Richmond and elsewhere, knowing that neither the officer transferring them, nor any other officer of the branch-bank at Charleston, had by virtue of his office the right to transfer these notes for such a purpose.    This extraordinary power of transferring the assets of the branch-bank at Charleston for this extraordinary purpose not having been even pretended to have been expressly conferred on any officer of the branch-bank at Charleston, it seems to me, that the acquisition of

this note by a transfer made under these circumstances, even had it been made by the cashier, was an acquisition of them in law *mala fide,* and could not therefore divest the Bank of Virginia of its title to these notes.

The most liberal case, which I have met with, to sustain the transfer of a negotiable note by the cashier of a bank under circumstances more or less suspicious is *The City Bank of New Haven* v. *Perkins,* 29 N. Y. 554. But the circumstances in that case were by no means as strong as in this to show, that the transferee knew, that the cashier was transferring the notes for an improper purpose. The court was of opinion, that he did not know it, and therefore it would not permit the actually improper purposes, which the cashier had in view, to be proven, or his authority to make the transfer to be disputed. But this was based on the fact, that the cashier of a bank has *ex officio* general authority to transfer the negotiable notes of the bank; and it is obvious, that had the transfer in that case been made by the president, the decision would have been different. Even in that case however had the defendant been deprived of a *bona fide* defence by this transfer, the court might have permitted the authority of the cashier to make the transfer to be disputed; but as the defendant did not dispute, that he owed the note, it was held, that he would not be permitted to interpose as his only defence, that the note was improperly transferred by the cashier, the only officer who by virtue of his official position had a general authority to transfer the negotiable notes of the bank.

But in the case before us the defendant had a *bona fide* defence against the enforcement of the payment of this note by the Bank of Virginia, its true owner, of which defence he would have been deprived, if he had not been permitted to show, that this note was transferred without authority. He had therefore an interest in this question, which the defendant did not have in the New York case. This defence was, that he had paid the note to the Bank of Virginia. The subsequent transfer of the note to Benj. H. Smith does not alter the case. The debt, for which it was transferred to him as collateral security, had been subsequently paid by Isaac N. Smith, and he had thereafter no interest in it, though, when the suit was brought, he had. Whether, before he was paid his debt,

Benj. H. Smith would be regarded as a *bona fide* purchaser of this note for a valuable consideration is questionable.    Judge Moncure in *Davis* v. *Miller*, 14 Gratt. 14, 15 says:

"There is perhaps no question connected with the mercantile law, which is of more importance, and upon which at the same time there is a more distressing conflict of authority, than the question, whether the holder of a negotiable note received as collateral security of a pre-existing debt is such a *bona fide* holder, as to be free of all equities existing against the note in the hands of the person, from whom he received it. The affirmative of the proposition, it seems, is maintained by the decisions in England, of the Supreme Court of the United States, in Massachusetts and some other states and also by Judge Story in his treatise on promissory notes § 195; while the negative is maintained in New York, Pennsylvania and other states. See the cases or most of them collected in 2 Rob. Pr. (new ed.) 249-251. In Virginia *Prentice &c.* v. *Zane,* 2 Gratt. 262 is the only case, which bears upon the subject, and seems to have been based on the supposed correctness of the negative side of the proposition. The note in this case was made in Philadelphia; and the decision conformed to the well settled law of the place of the contract. Whether the case would have been decided in the same way, if the note had been a Virginia contract, is uncertain. The question may therefore be considered as still unsettled in Virginia."

It is also unsettled in West Virginia and need not be decided in this case, as the debt, for which this note was transferred as collateral security, was afterwards paid off, and this gave to Isaac N. Smith just the same right, which he had, before the note was transferred. But this would not prevent the prosecution of a suit in the name of Benj. H. Smith. The law on this point is thus laid down in Daniel on Negotiable Instruments vol. 2 §§ 1191, 1192, pp. 205, 206:

"The law is now too well settled to admit of longer controversy, that an action on a bill or note payable to bearer or endorsed in blank may be maintained in the name of the nominal holder, who is not the owner, by the owner's consent. See *Demuth* v. *Culler,* 50 Me. 300; *Wheeler* v. *Johnson,* 97 Mass. 39; *Craig* v. *Twomey,* 14 Gray 486; *Whiteford* v. *Burchmeir,* 1 Gill 127. It matters not, that such nominal holder will re-

cover the amount as trustee, agent or pledger. The suit by him holding the paper shows his title to recover; and it cannot matter to the defendant, who discharges the debt, that the plaintiff is accountable over to a third party. Thus when the plaintiff had bought a bill for a correspondent, and had been reimbursed the amount paid, Wightman, Judge, said: 'They have been reimbursed, and the beneficial interest has been transferred, but the legal interest is in them, and they may still sue as trustees' *Poirier* v. *Morris*, 2 El. and Bl. 89. *Evidence however, that the plaintiff has no interest in the instrument will be competent, when foundation has been laid for its introduction by offer to prove offsets or other defences available against a third person who is the true owner."*

This suit must therefore be regarded just as if it had been brought by Isaac N. Smith, for whose benefit it is prosecuted. It may be said, that this would be true, if Isaac N. Smith had paid off the debt to Benj. H. Smith, for which this note was the collateral security, before the institution of this suit, but as it was not paid off till after the suit was brought, it cannot in any way affect the defendant's defence to this suit. We need not consider whether this position be sound or not. For as this note was transferred to Benj. H. Smith long after its maturity, even if he could be regarded as *bona fide* purchaser of it for valuable consideration and still held it, yet, for the simple reason that he took by a transfer long after its maturity, he could get no better title to it than Isaac N. Smith, the party, from whom he received it, had to the note. This was held in *Arnett* v. *Commonwealth* 18 Gratt. 773. In that case Judge Joynes says: "No principle is better settled, than that a party, who takes a negotiable instrument by endorsement or delivery, after it became due, gets no better title than the party had from whom he received it." See also *Brown* v. *Davis*, 3 T. R. 80; *Rothschild* v. *Carney*, 9 B. & C. 391; *Ashurst* v. *The Bank of Australia*, 37 Eng. L. & Eq. 195; *First National Bank* v. *County Commissioners*, 14 Minn. 79.

But even if Isaac N. Smith could have been regarded as a *bona fide* holder of this note, he would not be entitled to recover on it because, as we have seen, he could not deprive the defendant from controverting the right of the president of the branch-bank of Charleston to transfer this note to him, if the defendant did not really owe the note, and he offered what

would have been a good defence if it had still belonged to the president and directors of the Bank of Virginia, for though the defendant might not have been permitted to dispute the president's authority to transfer the note, if he, Smith, had received it *bona fide*, and the defendant had no other defence, yet if..he had a good defence against the Bank of Virginia, he would be permitted to dispute the validity of this transfer; and as against the Bank of Virginia the defendant proved payment of the note.

The note sued on was discounted by the Bank of Virginia by the directors of its branch at Charleston. If the suit had been brought by the bank, it would have been brought in the name of "the president and directors of the Bank of Virginia," which was the corporate name of the bank. After the maturity of this note it could have been paid to the owners of it, the president and directors of the Bank of Virginia, directly, if they chose to receive payment personally, or it could have been paid to its agency, the board of directors of its branch-bank at Charleston, who discounted it. It is true, that in the case of the *Bank of the Old Dominion* v. *McVeigh*, 20 Gratt. 457 and 26 Gratt. 785, it was decided that the branch-bank of the Old Dominion at Pearisburg, Giles county, Virginia, within the Confederate lines, had no authority to receive payment of a note, which the mother-bank, the Bank of the Old Dominion at Alexandria, within the Federal lines, had discounted; but the reverse is not true.

These decisions are based on the ground, that a branch-bank is an agency of the mother-bank, authorized to receive payment of notes discounted by such branch-bank only. But they do not affect the question, whether a mother-bank, if it thinks proper, may not receive payment of its debtor for any debt due it, no matter where it was contracted; and it does seem to me clear, that the payment to the mother-bank of a debt due to it, though it may have arisen from discounting a note by a branch-bank, is a discharge of a debt. Surely the principal, to whom a debt is due, may receive payment of it, though such debt arose out of a contract with an agent, and though that agent might have been authorized to receive payment of it. Was this note in fact paid? On January 25, 1865, the endorser of this note, Nighbert, paid on it by deposit in the mother-bank of Richmond $3,100. This left due on

the note less than $160. It is true, when he made this pay-
ment he misdescribed the note, stating that it was a note
drawn by him and endorsed by the maker, Lawson; but this
made no difference; for he owed to the bank but one debt
due at this time, and there can be no election how to apply a
payment, where there is but one debt in existence at the time
of the payment. See *Donally* v. *Wilson*, 5 Leigh 329. This
payment must have been applied to the payment of this one
debt, even had Nighbert made no election. But it may be
said, that while the board of directors of the bank at Rich-
mond had a right to receive payment of this note, the officers
of the bank, the cashier or teller, had no authority *virtute of-
ficii* to receive payment of this or of any other note discounted
by a branch-bank; and no express authority is proven to have
been given them by the board of directors of the mother-bank.
This position is sound.

But the president of the mother-bank held out to Nighbert,
that the officers of the mother-bank had authority to receive
payment of this note. It was expressly proven, that when
this payment was made, the president of the mother-bank told
him it was a good payment. It is true, that there was no
proof, that the officers of the mother-bank were in the habit
of receiving such payments, though this was probably the
truth, nor was there any express authority to receive such
payments proven; and therefore it was necessary to prove, that
the act of these officers in receiving this payment was con-
firmed by the board of directors. There was the clearest
proof, that they did confirm and approve this payment. When
it was made January 25, 1865, the fact, that it was made, was
proven to have been known to the president of the mother-
bank and by him approved expressly. The bank was open
and transacting regular business, and, there being no evidence
of its ever having been closed, it must be regarded as open
and doing a regular business from that time till the capture of
Richmond, and in the absence of any proof to the contrary
we must assume, that the board of directors had their regular
meetings during all this time. The president of the bank,
who knew of this payment when made, was the president of
the board of directors; and this board must therefore be re-
garded as cognizant of the fact, that this payment was made

and credited on the books of the bank as a payment. They never made any objection to the payment and never refunded the money paid; and we have seen, that from this proof it may be legitimately inferred, that they confirmed and approved the acts of their officers in receiving this payment. There was therefore a very small balance due on this note to the Bank of Virginia and nothing to the plaintiff in this suit; as he had received the note from one not authorized to transfer it with full knowledge that he had no authority to transfer it. However honestly he may have acted, or however much he may have been mistaken in his supposition, that on these known facts the law would hold, that McFarland had a right to transfer this note, still as in law McFarland had not a right to make this transfer, Smith can not be regarded as having obtained this note in good faith; and therefore he cannot recover upon it.

I have omitted to notice one argument strenuously urged by the counsel of the defendants in error to prove, that McFarland had authority to transfer the note, that is, that, as the Bank of Virginia could have been attached at once and compelled to pay the whole of the plaintiff's demand, therefore it was obviously for the interest of the Bank of Virginia, that McFarland should assume, as he did, the authority to transfer this note and the other assets of the bank, which he did transfer. This interest of the bank might have been a very strong reason, why the board of directors, if informed of this transaction, should have confirmed, what McFarland did; but it is no reason for the court holding, that McFarland had an authority, which it is clear from the evidence, that he did not have. It may be, that if the board of directors of the mother-bank had been informed of it, they might have approved of this act of McFarland, though I can hardly think, they would have so done; but they were not informed of it, and did not approve it, and it is idle to speculate, as to whether their interest was promoted or not, or whether, if called on, they would or would not have approved this act.

In conclusion I would say: had it been proven, that there was a *bona fide* transfer and delivery of the note sued on to Smith after its maturity, as the evidence tended to prove, there would have been no fatal variance between the declara-

tion, which declared, that this endorsement and delivery of the note was made at the time of the making of the note, and if there had been such variance, it could only have been taken advantage of at the trial by a motion to exclude the evidence or by a motion to instruct the jury to disregard it. This was expressly held in *Davis* v. *Miller &c.*, 14 Gratt. 19.

For these reasons the judgment of the circuit court must be reversed and annulled, and the plaintiff in error must recover of the defendant in error, B. H. Smith, his costs in this Court expended, and judgment must be rendered against the plaintiff below, and the attachment issued in this case must be quashed, and the defendants below must recover of the plaintiff below their cost, expended in the circuit court.

JUDGES HAYMOND AND JOHNSON CONCURRED IN THE OPINION OF JUDGE GREEN.

JUDGMENT REVERSED.