UNITED STATES NAT. BANK v. FIRST NAT. BANK OF LITTLE ROCK et al.

(Circuit Court of Appeals, Eighth Circuit. March 1, 1897.)

No. 823.

1. BANKS AND BANKING—REDISCOUNTS.
    A rediscount by a bank of its bills receivable, though it indorses the same, and becomes contingently liable for their payment, is not a borrowing of money by the bank, but has more the characteristics of a sale.

2. SAME—POWERS OF PRESIDENT—INDORSEMENT OF PAPER.
    It is within the scope of the implied powers of the president of a bank to indorse negotiable paper in the ordinary transaction of the bank's business, and a special authority to that end need not be conferred by the board of directors.

3. SAME—CUSTOM OF REDISCOUNTING.
    When a bank has long been in the habit of rediscounting its bills receivable in large amounts, all other banks in the same locality pursuing the same practice, and the president and cashier of such bank propose to its regular correspondent a rediscount of its bills, and there are no circumstances attending such proposal to arouse suspicion, the bank to which it is made may safely act upon it, without further inquiry, on the assumption that the act has either been specially authorized, or that the officers are acting within the purview of their general powers.

4. SAME—KNOWLEDGE OF DIRECTORS—ESTOPPEL.
    When the directors of a bank have known for many months that its paper was being rediscounted in large amounts, under the president's direction, and without consulting the board, and that the money so obtained was being used in the business of the bank, and they have made no inquiry as to how the paper was indorsed, the bank is estopped to dispute the authority of the president to indorse such paper for rediscount.

5. WRIT OF ERROR—DISMISSAL—INDORSEMENT OF FILING.
    A writ of error, which has been allowed, served, and returned to the appellate court with the transcript of the proceedings in the trial court, will not be dismissed because the clerk of the trial court has inadvertently failed to make an indorsement of its filing on the writ itself. Insurance Co. v. Phinney, 22 C. C. A. 425, 76 Fed. 617, disapproved.

In Error to the Circuit Court of the United States for the Eastern District of Arkansas.

John Fletcher (W. C. Ratcliffe with him on the brief), for plaintiff in error.

Sterling R. Cockrill (Ashley Cockrill with him on the brief), for defendants in error.

Before SANBORN and THAYER, Circuit Judges, and LOCH-REN, District Judge.

THAYER, Circuit Judge. This is the second writ of error which has been sued out in this case by the United States National Bank of New York, the plaintiff in error, hereafter termed the "New York Bank." When the case was here formerly (13 C. C. A. 472, 64 Fed. 985), we decided that the notes on which the suit is brought were in such form, and were so indorsed, when they were tendered to the New York Bank for discount, as to create the presumption that they were the property of the First National Bank of Little Rock, the defendant in error, hereafter termed the "Little Rock Bank," and that they had been acquired by the latter bank in the usual course of business, for value. We further held that this presumption was confirmed by the correspondence between the two banks relative to the discount of the notes, and that an instruction given by the trial court on the first trial was erroneous which told the jury, in substance, that the notes bore upon their face evidence which should have satisfied the New York Bank that they belonged to H. G. Allis, the president of the Little Rock Bank; that he was discounting paper which belonged to himself, and was using the name of the Little Rock Bank as an indorser for his own accommodation.

The facts proven on the second trial do not differ in any material respect from those proven on the first trial, and do not alter the conclusions announced in our former opinion. The New York Bank was the Eastern correspondent of the Little Rock Bank. Between June 21, 1892, when business transactions between the two banks commenced, and December 13, 1892, when the notes in suit were tendered for discount, the New York Bank had discounted, from time to time, for the Little Rock Bank, as the necessities of its business required, paper to the amount of about $175,000, the proceeds of which the Little Rock Bank had received and used. The application for the discount of the notes in suit was made both by W. C. Denney and H. G. Allis, who were, respectively, the cashier and the president of the Little Rock Bank, in letters which clearly showed that the discount was sought for and in behalf of the bank; and the reasons stated for asking the discount were such as would naturally disarm suspicion, namely, that the bank's customers were not shipping and selling their cotton, but were waiting for higher prices, which compelled the bank to rediscount some of its bills receivable. Besides, the cashier of the Little Rock Bank acknowledged the receipt of the proceeds of the notes in suit when they had been placed to the bank's credit by its Eastern correspondent. It must be held, therefore, that the record made on the last trial discloses no defense which should preclude the New York Bank

from recovering against the Little Rock Bank as an indorser of the notes in suit, notwithstanding the fact that H. G. Allis, the president of the latter bank, did wrongfully appropriate the proceeds of the rediscount, unless it be true, as contended, that the plaintiff bank could not lawfully deal with the officers above named in the matter of rediscounting paper without first ascertaining that they had been authorized by the board of directors to rediscount the notes in controversy, and that the president had been authorized to indorse them.

The second trial of the case was conducted on the theory, which was embodied in the charge of the trial court, that a rediscount by a bank of its bills receivable, where the paper is indorsed, constitutes a borrowing of money by the bank; and that the president of a national bank, by virtue of his office, has no power to indorse its commercial paper, or to rediscount its bills receivable. Proceeding from these postulates, the trial court further instructed the jury, in substance, that there was no evidence that the president of the defendant bank had any actual authority to indorse and rediscount the notes in suit; and that, before there could be a recovery, the plaintiff bank must show affirmatively that the board of directors of the defendant bank either knew that its president had previously exercised the power of indorsing and rediscounting its bills receivable, or that he had been permitted, without their actual knowledge, to exercise such powers, through a series of transactions such as would amount to a custom to do so, or else that the board of directors had negligently permitted him to carry on such a course of dealing with the plaintiff bank as to induce the latter to believe that the board of directors of the defendant bank had conferred upon the president thereof the power to indorse and rediscount its bills receivable. To all of these instructions exceptions were taken, and they constitute the errors to be reviewed.

We are of opinion that that part of the aforesaid charge which declared that a rediscount by a bank of its bills receivable, if it indorses the same, is a borrowing of money, and that part which declared, in substance, that the president of a national bank has no implied power to indorse its commercial paper, were erroneous. There is an obvious difference between a transaction where a bank goes into the market as a borrower, giving its own notes, bills, or other obligations for the money borrowed, and a transaction where it disposes of the notes and bills of third parties which it has previously discounted. In the former case it becomes primarily bound; it is the principal debtor; while in the latter, even if it indorses the paper, it only incurs a contingent liability, which may never ripen into an absolute obligation to pay. The latter transaction has more, if not all, of the characteristics of a sale, and it is generally regarded as a sale whereby assets of a certain kind are converted into cash. It may be said that a bank or an individual borrows money when they execute their own notes or bills, and receive the money thereon from a third party, even though the interest to accrue is deducted in advance, in the form of a discount. But we can see no propriety in characterizing the transaction as

a borrowing of money, when a person or a corporation sells commercial paper made by third parties, which they happen to own. There are some authorities, it is true, which maintain that the president of a bank has no implied power to bind the bank by an indorsement of commercial paper, and that, when an indorsement by the president is relied upon as transferring a title thereto, a special authority to indorse must be shown. Smith v. Lawson, 18 W. Va. 212, 228; Bank v. Hamlin, 14 Mass. 178, 180; Gibson v. Goldthwaite, 7 Ala. 281, 293. But we think the weight of reason and authority is in favor of the view that it is within the scope of the implied powers of the president of a bank to indorse negotiable paper in the ordinary transaction of the bank's business, and that a special authority to that end need not be conferred by the board of directors. Such implied power is generally conceded to bank cashiers, and we know of no sufficient reason why the implied powers of the chief executive officer of a bank should be more limited in this respect than those of its cashier. Bank v. Smith, 23 C. C. A. 80, 77 Fed. 129, 135; Fleckner v. Bank, 8 Wheat. 338, 360; Wild v. Bank, 3 Mason, 505, Fed. Cas. No. 17,646; Bank v. Perkins, 29 N. Y. 554, 569; Cooke v. Bank, 52 N. Y. 96, 114, 115; Bank v. Wheeler, 21 Ind. 90; Merchants' Bank v. State Bank, 10 Wall. 604, 650. It can hardly be expected that the cashier of a bank will be in attendance on all occasions when it becomes necessary for the bank to indorse notes and bills, draw drafts and checks, certify checks, or issue certificates of deposit. Such transactions as these are of hourly occurrence in all banks located in large business centers, and the exigencies of business demand that the power to perform such acts should be vested in some other officer as well as in the cashier. Our observation teaches us that such power is very generally exercised by bank presidents; and in ordinary transactions, no layman, we think, would hesitate to accept negotiable paper which had passed through a bank, because it was indorsed by the president, rather than by the cashier. In its practical operation the rule that a bank president has no implied power to indorse commercial paper for and in behalf of his bank would seriously interfere with the transaction of business, and put the public to great inconvenience, while it would have no marked tendency to prevent fraud or breaches of trust on the part of bank officers. The public interest requires that the same presumptions should attend an indorsement made by the president of a bank which exist in favor of an indorsement made by a cashier, and that banks should be held bound by acts of that nature when done by either of such officers in the ordinary course of business. Aside from these considerations, we think that it has been settled, so far as the federal courts are concerned, by the decision in People's Bank v. National Bank, 101 U. S. 181, that the president of a national bank, by virtue of his office, does possess the power to bind his bank by a contract of indorsement or guaranty, made in the usual course of business. It was held in that case, where the vice president of a national bank, contemporaneously with a sale of certain notes to another bank, guarantied their payment, that the latter bank could rightfully pre-

sume, without inquiry, that the vice president had authority to execute the guaranty. And the same doctrine has been approved by some of the state courts. Thomas v. Bank (Neb.) 58 N. W. 943; Palmer v. Bank, 78 Ill. 380; Thomp. Comm. Law Corp. § 4621.

We turn at this point to consider one of the most important questions in the case, and that is whether the transaction in controversy, to wit, the rediscounting of the notes in suit, was an act so far outside the sphere of ordinary banking as to impose upon the New York Bank the duty of ascertaining that the president and cashier of the Little Rock Bank had been duly authorized by its board of directors to rediscount the paper in question. That the power to rediscount its bills receivable was vested in the defendant bank admits of no controversy. The act, therefore, was not ultra vires. Bank v. Sharp, 6 How. 301, 322, 323; Bank v. Smith, 23 C. C. A. 80, 77 Fed. 129, 135; Bank of Genesee v. Patchin Bank, 13 N. Y. 309; Marvine v. Hymers, 12 N. Y. 223; Houghton v. Bank, 26 Wis. 663; West St. Louis Sav. Bank v. Shawnee Co. Bank, 95 U. S. 557, 559; Cooper v. Curtis, 30 Me. 488, 490; Davenport v. Stone (Mich.) 62 N. W. 722. In Bank v. Armstrong, 152 U. S. 346, 14 Sup. Ct. 572, it was decided that the borrowing of money by a national bank is such an unusual proceeding that when persons or corporations are solicited by a bank president to loan money to his bank they "must see to it" that the requisite authority to borrow money has been conferred by the board of directors. But the decision referred to did not go beyond that point, and, as we have already held that the conversion of bills receivable into cash by rediscounting them differs essentially from borrowing money, it is not a controlling authority in the case at bar. We are not left in doubt by the present record as to the practice of the defendant bank in the matter of rediscounting negotiable paper. The evidence shows, without contradiction, that it had long been in the habit of rediscounting its bills receivable in large amounts; that all other banks doing business in the same locality pursued the same practice, and that the demand for money at certain seasons of the year, usually in the summer and fall, made it necessary to convert a portion of their bills receivable into cash by selling them in the East. The plaintiff bank offered to prove by the official report of the comptroller of the currency that the amount of rediscounted paper held by national banks at various times between March 1, 1892, and January 1, 1893, ranged from $8,500,000 to $17,132,497, the largest amount being held in September, 1892, but the trial court rejected such proof. We think, however, that, notwithstanding the rejection of this proof, we must presume that the practice which was shown to exist among the banks located in Little Rock and in that vicinity prevails in other sections of the country, inasmuch as the defendant bank offered no testimony tending to show that banking operations are conducted differently in that region than they are elsewhere, or that the practice of rediscounting paper is confined to that locality. The laws of trade are generally uniform in their operation, and the same causes which at certain seasons of the year occasion a greater demand for money and a dearth of currency in one section of the country, doubt-

less produce the same results, at certain seasons, in other sections. It is the duty of banks to make all reasonable efforts to supply their customers with money for all legitimate business purposes. To that end it is their right to exercise all of their corporate powers, including the power to rediscount. On some occasions, if this latter power was not freely and speedily exercised, a bank would be derelict in the discharge of its obligations to the public. One of the most useful functions which banks perform is to equalize the distribution of money, and make the supply in their respective localities satisfy, as far as possible, the demands of trade and commerce, by withdrawing money, as the occasion requires, from those financial centers where it has a tendency to accumulate. It is obvious that this function can be best performed by banks by selling or rediscounting a portion of their bills receivable in those places where money is most abundant and cheap; and we have no doubt that it is usually so performed, and that many banks throughout the country are in the habit, at certain seasons of the year, of replenishing their stock of money by such means. It results from these considerations that we are unable to assent to the proposition that the rediscounting by a bank of its negotiable paper is a transaction so far outside the scope of ordinary banking transactions as to impose upon the bank buying such paper the duty of ascertaining that the act has been specially authorized by the board of directors. If, as in the present case, the proposal to rediscount emanates from the president and cashier of a bank, and is made to its regular correspondent, and there are no circumstances attending the transaction which are calculated to arouse suspicion, we think that the bank to which the proposal is addressed may safely act on the propositon without further inquiry, on the assumption that the act has either been specially authorized, or that the officers from whom the proposition emanates are acting within the purview of their general powers.

But, whether the conclusion last announced be sound or unsound, we are satisfied, in either event, that in the present case the defendant bank is estopped from asserting, as against the plaintiff bank, that its president had no authority to indorse and rediscount its negotiable paper. It is a fact which admits of no controversy that for many months prior to the transaction in question the president of the Little Rock Bank had been in the habit of rediscounting its bills receivable, as the exigencies of business demanded. Reference has already been made to the fact that during the six months preceding the rediscount of the notes in suit, rediscounts had been obtained from the New York Bank to the amount af about $175,000, the proceeds of which the Little Rock Bank had received and used. This power, it seems, had been exercised with the knowledge and concurrence of the cashier of the Little Rock Bank, but without any formal action having been taken by its board of directors. All of the directors, however, who testified at the trial, admitted, in substance, that they were aware that the bank had been in the habit of obtaining rediscounts. Indeed, a report made to the comptroller of the currency on July 12, 1892, which was read in evidence,

and was sworn to by three of the directors, showed the amount of rediscounted notes and bills then outstanding and held by other banks to be $81,748.80. Under these circumstances, it is quite immaterial that three of the directors testified that they were not aware that the president had ever been authorized to indorse and rediscount its bills receivable. They did know that paper was being rediscounted in large amounts under the president's direction without consulting the board, and that the bank was using in its daily business transactions the money so obtained. Knowing this fact, it was their duty to inquire and to ascertain in what way paper was being rediscounted, whether by the indorsement of the cashier or by the president, if they considered the mode of indorsement of any importance. By their silence and acquiescence they ratified the practice of obtaining rediscounts which the president had seen fit to adopt, and remitted the whole matter to his judgment and discretion., The president was, in effect, held out to the world, or at least to those banks with which he dealt, as having the powers which he assumed to exercise; and in a controversy between one of such banks, with which he had large dealings, and the defendant bank, the latter will not be heard to deny such authority. Merchants' Bank v. State Bank, 10 Wall. 604, 645, 646; Butler v. Cockrill, 36 U. S. App. 702, 712, 20 C. C. A. 122, and 73 Fed. 945, and cases there cited; Farmers' & Mechanics' Bank of Kent Co. v. Butchers' & Drovers' Bank, 16 N. Y. 125, 134, 135.

But one other point remains to be noticed, and that is the contention of counsel for the defendant bank that the writ of error should, in any event, be dismissed, for the reason that the writ itself does not bear an indorsement by the clerk of the trial court to the effect that it was filed in that court. The writ of error, as contained in the record, shows that it was allowed by the trial judge, and that service thereof was acknowledged by counsel for the defendants in error on June 20, 1896, the judgment having been rendered on May 28th of that year. The writ of error is returned to this court by the clerk of the trial court as a part of the transcript of the proceedings in that court. It is obvious, therefore, that the writ of error was lodged with the clerk of the trial court as the law requires, and that he has treated it as filed, and obeyed the order therein contained. Under these circumstances, the plaintiff in error has done all that the law requires him to do to obtain a review of the proceedings of the trial court, and its rights should not be sacrificed because the clerk has failed, inadvertently, to note the filing of the writ of error by an indorsement made on the writ itself. It is very likely that the filing of the writ of error is shown by the journal of the proceedings of the trial court on the day the writ was lodged with the clerk, and under the circumstances we may well presume that the fact does thus appear. We have examined the decision in the case of Insurance Co. v. Phinney, 22 C. C. A. 425, 76 Fed. 617, to which our attention has been directed, but we are not able to concur in the view that seems to have been entertained by the majority of the judges in that case. We think it is altogether the more reasonable view that the substan-

tial requirements of the law are satisfied when the record shows that the writ of error was actually lodged with the clerk, and that it is the lodgment of the writ with that officer, rather than the notation of the filing, which renders it operative.

It results from what has been said that in several important respects, as heretofore indicated, the jury were misdirected, to the prejudice of the plaintiff in error. In view of the undisputed facts which the record discloses, we think that the plaintiff bank was entitled to a judgment in its favor, and that at the conclusion of the evidence the trial court should have so declared, The judgment of the circuit court is accordingly reversed, and the cause is remanded for a new trial.