## STATE BANK OF WESTPORT v. MAGRAW, KERFOOT & COMPANY.[1]

April 17, 1924.

No. 23,869.

**Authority of bank president to indorse and transfer its draft—defendants without notice of wrong.**

The president of plaintiff sold and indorsed a draft payable to its order, and, in payment, received defendants' check payable to his order and a Liberty bond transferred to him. In this action against defendants for money had and received and for conversion of the draft it is *held*:

(1) The proof, aided by section 8448, G. S. 1913, establishes prima facie authority in the president to indorse and transfer the draft to defendants.

(2) The evidence fails to show knowledge or notice to defendants that the plaintiff's president wrongfully sold and transferred the draft, or that he intended to appropriate the proceeds thereof to his personal use.

Action in the district court for Ramsey county to recover $5,000. The case was tried before Michael, J., who when plaintiff rested granted defendants' motion to dismiss the action. From the judgment entered pursuant to the order for judgment, plaintiff appealed. Affirmed.

*Lancaster, Simpson, Junell & Dorsey* and *Robert Driscoll*, for appellant.

*Oppenheimer, Peterson, Dickson & Hodgson* and *Ambrose Tighe*, for respondents.

HOLT, J.

The appeal is from the judgment entered upon the order dismissing the case when plaintiff rested.

The complaint declares on two counts, one for money had and received, and one for conversion of a $5,000 draft belonging to plaintiff. The answer is practically a general denial.

[1]Reported in 198 N. W. 422.

A. H. Turrittin, plaintiff's president, lived in Minneapolis, and had been or was, at the time of the transaction here in question, president of the Lincoln Bank in that city. Fred W. Hales was plaintiff's cashier in active charge of its business at Westport. These two men, and Turrittin's father-in-law, I. W. Bouck of Little Falls, constituted the board of directors of plaintiff. Bouck appears to have given scant attention to the business and was often absent from the board meetings, which were held irregularly. So far as disclosed by the evidence this was practically Turrittin's bank, run by him and the cashier. The former owned 47 per cent of the shares of stock. It does not appear how much his father-in-law or the cashier owned. When it was necessary to raise funds for the bank's use Turrittin attended thereto, transferring its notes and bills, and disposing of Liberty bonds sent him for that purpose.

In the first part of July, 1921, Hales advised Turrittin that money was needed by the bank, and requested him to raise it. It was arranged that plaintiff should issue a certificate of deposit for $10,000 and send it to Turrittin, who undertook to raise money thereon at the Federal Land Bank of St. Paul. This was done, and Turrittin obtained two drafts of $5,000 each from the land bank payable to the order of plaintiff. One of these drafts, and the one upon which this action is based, Turrittin disposed of to defendants, who were in the bond and investment business at St. Paul. In the purchase of this draft defendants gave their check payable to the order of Turrittin for $4,119.57, and also a Liberty bond of $1,000, at the then market value of $877.93. The balance of $2.50 was a brokerage charge. The draft when proffered defendants bore the indorsement: "State Bank of Westport, Minnesota, per A. H. Turrittin, President." Defendants gave a so-called bill of sale of the bond to Turrittin. Defendants obtained the money on the draft, and their check to Turrittin was paid. What disposition Mr. Turrittin made of the proceeds of the check or where the Liberty bond went does not appear. About two weeks after Hales had sent the certificate of deposit to Turrittin, he asked the latter what had become of it, and was told the land bank did not want the loan until after the bank examiner's inspection had taken place. No other inquiry was

made until the day before Turrittin's death, which occurred on October 6, 1921. Apparently, the proceeds never reached the vaults of plaintiff.

In opening to the jury plaintiff's counsel said: "The State Bank of Westport makes absolutely no claim that either Mr. Magraw or Mr. Kerfoot or any one in their employ was conscious at the time they enabled Mr. Turrittin to do what he did that there was anything wrong whatever. We make no claim of collusion on their part or of any bad faith in the sense of a conspiracy to defraud the State Bank of Westport. Nothing of that kind will be shown." During the trial this question was asked Hales: "But you had quite frequently sent certificates of deposit to Turrittin to use to raise money for the bank?" He answered: "Why, yes, we sent it to him to get money for us."

Unless the proof was sufficient to permit a jury to find that the title to the draft did not pass from plaintiff to defendants, the dismissal was right. Plaintiff had the burden of proof that title did not pass. The draft was negotiated by the chief executive officer of plaintiff, and bore its indorsement. Its by-laws provide: "The president and cashier shall be responsible for all moneys, funds and valuables of the bank intrusted to their care by the board of directors, or which otherwise may come into their hands as president or cashier." Plaintiff's counsel make this concession in their brief: "It is doubtless true that the president of a bank has the implied authority, in the absence of a definite restriction, to indorse negotiable paper belonging and payable to the bank, but even if this authority were expressly given by the by-laws without any qualification, it would necessarily be limited to the indorsement of such paper for the purposes of the bank." This is probably true according to later decisions, and the facts here disclosed.

In United States Nat. Bank v. First Nat. Bank of Little Rock, 79 Fed. 296, 24 C. C. A. 597, it is said:

"There are some authorities, it is true, which maintain that the president of a bank has no implied power to bind the bank by an indorsement of commercial paper, and that, when an indorsement by the president is relied upon as transferring a title thereto, a

special authority to indorse must be shown. Smith v. Lawson, 18 W. Va. 212, 228; Bank v. Hamlin, 14 Mass. 178, 180; Gibson v. Goldthwaite, 7 Ala. 281, 293. But we think the weight of reason and authority is in favor of the view that it is within the scope of the implied powers of the president of a bank to indorse negotiable paper in the ordinary transaction of the bank's business, and that a special authority to that end need not be conferred by the board of directors. Such implied power is generally conceded to bank cashiers, and we know of no sufficient reason why the implied powers of the chief executive officer of a bank should be more limited in this respect than those of its cashier."

After that case was sent back, judgment was directed in favor of plaintiff, and this was affirmed in Auten v. United States Nat. Bank, 174 U. S. 125, 19 Sup. Ct. 628, 43 L. ed. 920. See also State v. Corning State Sav. Bank ,139 Iowa, 338, 115 N. W. 937. Moreover, section 8448, G. S. 1913, as construed by this court, gives to this indorsement the effect of prima facie proof of authority to make it. Moore v. Holmes, 68 Minn. 108, 70 N. W. 872; Kelly v. Southern Amusement Co. 131 Minn. 386, 155 N. W. 214. Prima facie then, the indorsement was duly authorized, and passed title to defendants, and the question of apparent authority does not arise.

Plaintiff contends that Turrittin negotiated the bank's draft to defendants' knowledge for his personal use and not for that of the bank, and hence there was a conversion. The only basis in the record for this claim is that the check given for the draft ran to Turrittin as payee, and he was named in the sales bill of the Liberty bond as the one to whom it was sold. This merely relates to the manner of paying for the draft. It does not show that Turrittin intended to use what he obtained for his own purposes. Under the by-law referred to, he was the custodian of the bank's funds, and defendants, in dealing with him as such, were justified in paying for the draft in such medium and form as he might request, so long as it did not appear that he wrongfully sold the draft or was intending to appropriate the proceeds for his own use. The facts disclosed and the admissions of counsel, that bad faith or collusion could not be charged against defendants, make the case very similar to that

of Merchants Nat. Bank v. McNeir, 51 Minn. 123, 53 N. W. 178, and warranted the order of dismissal.

It may also be said that whatever evidence was adduced in this case tended to show that defendants were good faith purchasers for full value of this draft, and there being no evidence whatever of want of authority in Turrittin to indorse and transfer it, no jury question was made.

Cases, cited by plaintiff, involving the indorsement of commercial paper or checks by minor agents acting without authority are not in point. Such are: Columbia Mill Co. v. Nat. Bank of Commerce, 52 Minn. 224, 53 N. W. 1061; Dispatch Printing Co. v. Nat. Bank of Commerce, 109 Minn. 440, 124 N. W. 236, 50 L. R. A. (N. S.) 74; Knoxville Water Co. v. East Tenn; Nat. Bank, 123 Tenn. 364, 131 S. W. 447. Nor are those helpful in which makers of negotiable instruments are sued by alleged innocent holders for value before maturity, such as First Nat. Bank of Rolette v. Andersen, 144 Minn. 288, 175 N. W. 544. And, of course, where a negotiable instrument of a corporation is by an officer thereof executed and made payable to himself or order, an indorsee is charged with knowledge of its invalidity; or, where such an instrument, payable to the corporation or its order, is indorsed by an officer thereof and used to pay his individual debt to the indorsee or, to the latter's knowledge, is to be used to acquire property for such officer, the amount may be recovered by the corporation from the indorsee as money had or received or upon the theory of conversion. Cases involving such questions do not aid us here.

Among those cited by plaintiff are : Third Nat. Bank v. Marine Lumber Co. 44 Minn. 65, 46 N. W. 145; Porter v. Winona & D. Grain Co. 78 Minn. 210, 80 N. W. 965; First Nat. Bank v. Flour City Trunk Co. 118 Minn. 151, 136 N. W. 563; Ward v. City Trust Co. 192 N. Y. 61, 84 N. E. 585. Here it is conceded that the transaction with defendants was on their part in good faith and that neither of them was conscious of anything wrong whatever, and no proof that defendants knew of any purpose of Turrittin to convert either the draft or the proceeds to his own use.

The alleged laches of plaintiff need not be considered upon this appeal.

The judgment is affirmed.