AMERICAN NATIONAL BANK OF ST. PAUL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 14702, 30751, 33212.  Promulgated November 28, 1928.

*William Oppenheimer, Esq.*, for the petitioner.
*L. A. Luce, Esq.*, for the respondent.

OPINION.

LANSDON: The petitioner seeks the relief claimed in issue (1) as set forth in our findings of fact under section 234(a)(3) of the Revenue Act of 1918, which allows as a deduction from gross income "taxes paid or accrued in the taxable year." The amounts in question represent capital stock taxes assessed by the State of Minnesota. The applicable provisions of the state taxing statutes are as follows:

2018. *Same*—The stock of every bank and mortgage loan company in this state, organized under the laws of this state or of the United States, shall be assessed and taxed in the town, city or village where such bank or mortgage loan company is located, whether the stockholders of such bank reside in such place or not, and shall be assessed in the name of the bank or mortgage loan company. * * * ('78 c. 1 Sec. 24, amended '05 c. 60 Sec. 1).

2019. *Banks—List of Stockholders*—In every bank and banking office there shall be kept at all times a full and correct list of the names and residences of the stockholders or owners or parties interested therein, showing the number of shares, and the amount held, owned, or controlled by each party in interest, which list shall be subject to the inspection of the officers authorized to assess property for taxation, and the accounting officer of each bank or banking institution shall furnish to the assessor a duplicate copy of such list, verified by oath, which shall be returned and filed with the county auditor. (841).

2020. *Taxes on bank stock a lien*—To secure the payment of taxes on mortgage loan company, bank stock or banking capital, every bank or mortgage loan com-

pany shall retain so much of any dividends belonging to such stockholders or owners as shall be necessary to pay any taxes levied upon their *shares of stock or interest*, respectively, and such bank or mortgage loan company, or officers thereof, shall pay the taxes, and shall be authorized to charge payment of such taxes to the expense account of such bank. (842).

The parties agree that the deductions from income here sought were taxes assessed against the value of shares of the petitioner's outstanding stock in the hands of its stockholders. If such taxes are the primary obligations of the stockholders and the provisions of the law indicate that the petitioner is no more than a collecting agent for the State of Minnesota, the determination of the Commissioner must stand. The petitioner contends, however, that under the provisions of section 2020 it has the right to accept the obligation to pay as its own, charge the payment so made to expenses, and deduct the amounts thereof from income as taxes paid within the meaning of the Federal taxing act.

In support of its contention the petitioner relies on *Ferguson* v. *Fidelity Union Trust Co.*, 24 Fed. (2d) 520. This case arose in New Jersey, where the state law imposed a capital stock tax in terms somewhat similar to the Minnesota statutes, *supra*. The New Jersey statute provides that the tax on the shares, against whomsoever assessed, " shall be in lieu of all other state, county, or local taxation on such shares or upon any personal property owned or held by the bank * * *." This being true, the General Assembly evidently decided that the tax, though in terms assessed against shares held by the stockholders, is nothing more than a tax against the bank which the bank might as well pay under a direct assessment against it. Accordingly, it provided in section 8 of that act that if, before an assessment is made on its shares, the bank " shall, by resolution of its board of directors " filed with the taxing authorities, " request the county board of taxation to assess to and in the name of the bank * * * the entire taxable value of all the shares of stock therein, instead of assessing the same to and in the name of the individual shareholders owning the same, and if such bank, * * * shall promise and agree that it will pay the taxes levied against such shares * * * then the total amount of the capital, surplus and undivided profits shall be assessed to and in the name of the bank, * * * the tax shall be a lien against the property and assets of the bank * * * and collectible as other taxes are collected: Provided, that nothing herein contained shall be construed as a taxation of property as distinguished from capital stock."

In the *Ferguson* case the bank adopted the resolution set forth above and the court held that by such action it became primarily responsible for the tax as its own obligation and that upon payment

it is entitled to deduct the amount thereof from its gross income in the taxable year, as provided in the Federal taxing statutes.

The petitioner contends that the provision in the Minnesota statute, which authorized it to pay the capital stock tax and charge such payment to its expense account brings it within the rule laid down in the *Ferguson* case. To our minds that case is readily distinguishable from the proceeding at bar. In New Jersey the bank was required to take action before the tax was assessed and thereby inform the state taxing authorities that it accepted obligation to pay any such tax that might be assessed. In Minnesota no such duty is imposed on the bank. It can do nothing until the tax is paid. After payment it may do either of two things; that is, collect the amounts so paid from its stockholders by withholdings from dividends due, and it may charge such payments to expense. These two things do not appear to be alternatives. From the language of the statute it is clear that the bank may retain from dividends the amounts of taxes paid for its shareholders and at the same time charge such payments to expense. It may be that authority to charge to expense was granted only for the purpose of making balancing entries for the amounts paid out pending the time when they might be recouped by charges against the accounts of the several stockholders. But even if the bank never charges its stockholders the amounts paid as taxes on its shares of capital stock, it does not follow that it would be entitled to the deduction here sought. For the moment the stockholders appear to have benefited from the procedure, but in fact their interest in the assets back of their stock has been diminished by the exact amount charged to expense. This result in turn is not without advantage to the bank and its stockholders since the capital stock tax for each year is based upon the book value of outstanding stock, which is thus decreased with a corresponding reduction of capital stock liability for the following year.

Counsel for petitioner also cites and to some extent relies on *United States* v. *Guaranty Trust & Savings Bank*, 253 Fed. 291, in which the court held that under the law of Florida the state tax on the capital stock of a corporation is a primary obligation of such corporation, therefore deductible from gross income in the computation of net income for Federal tax purposes. Neither that case nor the *Ferguson* case, *supra*, is in point here unless the provisions of the Minnesota statute authorize the petitioner to accept the tax liability as its own. This we do not think is the situation. If the stockholders received any benefit in the circumstances here it was through the voluntary action of the petitioner which paid the taxes due by its shareholders and failed to recoup such payment by the method prescribed in the statute. We are unable to distinguish such

action from the payment of a dividend out of surplus. It was done by corporate action. It probably resulted in benefits to the stockholders. It reduced the surplus available for the payment of dividends.

The petitioner further argues that inasmuch as the Revenue Act of 1921 makes express provision for the deduction of taxes in the circumstances herein, we should accept such congressional action as a mere clarification of the legislative intent expressed in the provision under which the deduction is claimed and cites many impeccable authorities in support of this theory. In our opinion the additional provision in the Act of 1921 in respect of the deduction of taxes on corporate stock was new legislation and in no sense a mere clarification of the language of section 234(a)(3) of the Revenue Act of 1918. It is not necessary therefore to discuss or distinguish the decisions cited in this connection.

In his brief counsel for petitioner contends that inasmuch as the taxes paid were illegal and could not have been collected by the State of Minnesota, as was held in *Minnesota* v. *First National Bank*, 273 U. S. 561, and as voluntary payments of illegal taxes can not be recovered by action at law, in that State, the amounts here involved should be regarded as losses sustained by the petitioner in the respective years in which such payments were made. We have held above that the petitioner voluntarily relinquished its right to recover these payments from its shareholders. In such circumstances we regard it as immaterial that no right of recovery could have been maintained against some one else. In *Inland Products Co.*, 10 B. T. A. 235, we held that taxes voluntarily paid to the Federal Government in error of law were not deductible from gross income as losses sustained in the years in which such payments were made and we think that decision is controlling here.

In all essential particulars the principles involved here are identical with those in *Bank of Commerce*, 3 B. T. A. 950. Cf. *Porter* v. *United States*, 27 Fed. (2d) 882. On this point we approve the determination of the Commissioner. It follows also that having determined that the payments here involved were in the nature of dividends to stockholders, the Commissioner must be sustained in his ratable reduction of the petitioner's invested capital as logical and legal consequence of such distribution.

On December 31, 1920, the petitioner had rediscounts with the Federal Reserve Bank in the total amount of $462,300. In its computation of invested capital for the purpose of determining its profits-tax credit for the taxable year it included in its total assets the value of all its customer's notes then unpaid, whether such notes were in its own vaults or had been rediscounted. Its theory is that

when it rediscounts paper to the Federal Reserve Bank it in effect borrows the money so obtained and pledges its customers' notes as security for the payment thereof. If this theory is sound, both the amount of the rediscounted notes and the cash received thereon should be included in its total assets in the determination of the ratio of admissible to inadmissible assets.

The Commissioner excluded from total assets, as claimed by petitioner, the amount of notes rediscounted and held by the Federal Reserve Bank on the theory that the rediscounting of the paper was a sale. If the contention of the respondent is sound its effect is to increase the ratio of inadmissible assets and correspondingly decrease the petitioner's profits-tax credit and increase its tax liability. The parties have no controversy over facts or amounts and agree to a redetermination of tax liability for the year 1920, under Rule 50, if we find that the determination of the Commissioner was erroneous.

The transactions in question here are authorized by the Federal Reserve Banking Act, United States Code Annotated, Title 12, Banks and Banking, which provides two methods by which a member bank may procure funds from the Federal Reserve Bank:

(1) § 343. *Discount of Obligations Arising Out Of Actual Commercial Transactions.* Upon the indorsement of any of its member banks, which shall be deemed a waiver of demand, notice and protest by such bank as to its own indorsement exclusively, any Federal reserve bank may discount notes, drafts, and bills of exchange, arising out of actual commercial transactions; * * *

(2) § 347. *Advances to Member Banks On Their Notes.* Any Federal reserve bank may make advances to its member banks on their promissory notes for a period not exceeding fifteen days at rates to be established by such Federal reserve banks, subject to the review and determination of the Federal Reserve Board, provided such promissory notes are secured by such notes, drafts, bills of exchange, or bankers' acceptances as are eligible for rediscount or for purchase by Federal reserve banks under the provisions of this chapter, or by the deposit or pledge of bonds or notes of the United States.

Every note discounted under the provisions of section 343 must bear the unrestricted indorsement of the member bank, which indorsement shall be "deemed a waiver of demand, notice and protest by such bank." That provision of the statute has been construed by the court in *Federal Reserve Bank* v. *First National Bank*, 277 Fed. 300, to create a primary liability on the part of the member bank so that the amount of the note can be collected directly from the member bank without first exhausting its remedy against the maker. The liability, however, is on the indorsement and there is nothing to prevent the indorsee from going against the maker.

No doubt the practice which has grown up concerning such transactions is the result of this statutory liability. At maturity the note is charged to the account of the member bank, having been sent to

the member bank a few days prior to that date, without regard to whether or not collection is accomplished.

The evidence is clear that petitioner did not give its promissory note as provided for in section 347, but that it discounted the paper according to the provisions of section 343. Did such a transaction constitute a sale and pass title to the paper, as the respondent contends, or was it a borrowing of money on the notes so that title remained in the indorser as contended by the petitioner.

There is nothing in the Act or in its legislative history which throws any light on how Congress intended rediscounts to be regarded. A letter from the Comptroller of the Currency, addressed to the petitioner, called its attention to excessive borrowings from the Federal Reserve Bank and requested that such borrowings be reduced. The examiner's report, provided by the Comptroller of the Currency, includes in liabilities all rediscounts with Federal Reserve Banks as borrowed money. In its regular statements and in the balance sheets included in its income-tax return for 1920 the petitioner lists bills payable and rediscounts as separate liability items and includes in the total of its loans and discounts to its customers the full amount of its rediscounts to the Federal Reserve Bank.

The courts and legal writers have carefully distinguished between the terms " discount " and " loan." Morse on Banks and Banking, 6th ed., secs. 49, 72 and 73, discusses the distinction at some length as affected by the usury laws:

First it is clear that a bank may purchase in the sense of acquiring title; if a note is deposited. credited as cash, and drawn against, the bank is a holder for value; discounting even in its most limited sense, that of mere lending, gives title * * *. But all transfers of negotiable paper to a bank are subject to usury laws, and it has no right to take paper at a greater reduction.

To discount includes to buy, for discounting is at most but another name for buying at a discount. *Tracy* v. *Talmadge*, 18 Barb. (N. Y.) 462.

A note taken in the usual course of business may be deemed to have been " discounted " though the term " purchase " might apply to the transaction. Purchase may be made by " discount " as well as by " loan ", i. e., the absolute title to the note may pass to the bank; if the customer assumes any responsibility it is a loan; if he does not, it is an advance made to him in consideration of the transfer without recourse, or by delivery in case of paper payable to bearer. If the bank takes more than the law allows in one case as in the other it is usury, but the word " purchase " properly applies. *First Natl. Bank* v. *Sherburne*, 14 Ills. App. 566.

All bank transactions are subject to usury laws and are called discounts to indicate that fact, though the same transactions between individuals would be called a purchase, and be free from the taint of usury. *Niagara County Bank* v. *Baker*, 15 Ohio St. 68.

Bouvier's Law Dictionary defines the term " discount " as follows:

To discount signifies the act of buying a bill of exchange or promissory note for a less sum than that which upon its face is payable.

In *United States Nat. Bank* v. *First Nat. Bank of Little Rock*, 79 Fed. 296, the Circuit Court of Appeals had before it the question of ownership of paper rediscounted. At page 298 it states:

. We are of opinion that that part of the aforesaid charge which declared that a rediscount by a bank of its bills receivable, if it indorses the same, is a borrowing of money, and that part which declared, in substance, that the president of a national bank has no implied power to indorse its commercial paper, were erroneous. * * * It may be said that a bank or an individual borrows money when they execute their own notes or bills, and receive the money thereon from a third party, even though the interest to accrue is deducted in advance, in the form of a discount. But we can see no propriety in characterizing the transaction as a borrowing of money, when a person or a corporation sells commercial paper made by third parties, which they happen to own. * * *

It is a well settled principle of the negotiable instruments law that an unrestricted indorsement of a negotiable note and delivery thereof passes title to the indorsee. In *City of Douglas* v. *Federal Reserve Bank of Dallas*, 271 U. S. 489, the Supreme Court held that when paper is indorsed without restriction by a depositor, and is at once passed to his credit by the bank to which he delivers it, he becomes the creditor of the bank; the bank becomes the owner of the paper, notwithstanding a custom or agreement to charge the paper back to the depositor in the event of dishonor. Cf. *Lincoln Nat. Bank of Pittsburgh* v. *Miller*, 100 Atl. 269; *Smouse* v. *Waterloo Savings Bank*, 199 N. W. 350. In *Hamilton Nat. Bank* v. *Emigh*, 192 S. W. 913, the court held that where a bank receives a note indorsed without restriction and gives credit to a depositor in his checking account and such proceeds are checked out, the bank becomes the absolute owner of the note. Where the amount credited is not withdrawn and there is an agreement that 75 per cent of the amount received on the note must be maintained as a balance in the account the transaction is held to be a loan. *Merchants' Nat. Bank of Mandan* v. *First Nat. Bank of Duluth*, 238 Fed. 502. Other facts contained in that case distinguish it from the preceding cases and from the instant case. Where negotiable paper is delivered for value in the usual course of business, as collateral security, a valid title vests in the holder, similar in all respects to that held by an unconditional indorsee. *Roach* v. *Halvorson*, 148 N. W. 1080; *Thompson* v. *Jordan*, 171 S. W. 1016. In the instant case, however, the petitioner would have equitable title to the paper, if the transaction were a loan with the notes as collateral security.

From the cases and texts above cited, it seems to be well settled that to discount negotiable paper is to sell it. We have found no provision in the Reserve Banking Act which changes such generally accepted principle as to transactions between Federal Reserve Banks and member banks. It follows that petitioner sold its rediscounted

paper to the Federal Reserve Bank and that such bank thereby became owner in exactly the same sense that petitioner owns the notes it discounts for its customers. The respondent's determination is approved.

In the circumstances set forth in our findings of fact, the petitioner charged off its remaining investment in German ambassadorial notes on December 31, 1921. In its income and profits-tax return for such year it deducted a portion of such charge-off in the amount of $39,500 from its gross income as a debt ascertained to be worthless and charged off in the taxable year. Upon audit the Commissioner added this amount to the petitioner's income. The evidence discloses the facts upon which the petitioner relies to sustain its contention on this issue. No payments had been made on the notes for more than two years. They were not quoted or listed on any securities market in the country. The principal authority on the value of such securities in the taxable year did not list them in his estimate of the prices of various obligations of the German Government. A letter from the office of a Minnesota Senator advised that such notes had been disallowed by the Attorney General as claims against funds in the hands of the Alien Property Custodian. The charge-off was made in conformity with orders from the national bank examiner.

In support of the action of the Commissioner in disallowing the charge-off of the German securities in question, the respondent relies on the fact that the notes have never been repudiated by the German Government, that all reasonable and usual efforts for the collection of bad or doubtful accounts had not been made, and that the notes were afterwards collected in full by a suit at law against the Alien Property Custodian. He also contends that a bank examiner's order to eliminate securities from the assets of a bank is not evidence of worthlessness within the meaning of the statute. After consideration of all the evidence and arguments and a comparison of the facts here with those established in many similar cases heretofore decided by the Board, we conclude that on this issue the evidence adduced by the petitioner is not sufficient to overcome the presumption that the determination of the Commissioner was correct. *West LaFayette Bank*, 12 B. T. A. 1356; *P. H. Gill & Sons Forge & Machine Works*, 7 B. T. A. 1146.

The petitioner's alternative contention in respect of the German notes is that the deduction sought should be allowed as a loss sustained in the taxable year. Since no loss applicable to the tax liability here in controversy was sustained unless the notes in question became worthless in the taxable year, our conclusion here must follow that which we have reached as the right of the petitioner to this deduction as a bad debt. *First National Bank of St. Paul*, 10 B.

T. A. 32; *First National Bank, Parkers Landing, Pa.*, 12 B. T. A. 1387; *Hector Fezandie, Executor*, 12 B. T. A. 1325.

Petitioner complains of respondent's action in increasing net income of 1923 and 1924 by the amounts of $1,072.40 and $536.19, respectively, being the respective amounts of the credit balances in the reserve account "Depreciation on Canadian currency" at the close of those years. Respondent's action is based on the ground that the reserve account had been set up by deductions from income, to cover anticipated losses upon the sale of the currency on hand. Respondent's action is erroneous, because it is entirely clear from the evidence that the amounts credited to the reserve account were not deducted from income. The credits to the reserve account were made at the time the currency was purchased, and counterbalanced the appreciation taken into the accounts when the currency was taken up at a value in excess of the price paid for it. Net income was not affected by this accounting procedure, and the result, from an accounting standpoint, was not different than would have been the case had petitioner taken the currency into its accounts at the price paid for it. On this issue, the determination of the respondent is reversed.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

MILLIKEN dissents in part.